MFS/SUN LIFE TRUST–HIGH YIELD SERIES, Massachusetts Financial High Income Trust and Lifetime High Income Trust, Plaintiffs,

v.

VAN DUSEN AIRPORT SERVICES COMPANY, Limited Partnership, Mast Resources, Inc., Air Partners, Inc., MTH Holdings, Inc., Miller Tabak Hirsch & Co., MTH Co., LDH Partners, SLT–II, Inc., (formerly SLT Inc.), JDM Inc., VII Partners, Limited Partnership, Jeffrey D. Miller, Jeffrey S. Tabak, Susan L. Tabak, Gary D. Hirsch, Eugene A. De-Palma, Richard Meli, James A. Lash and John Does 1 Through 50, Defendants.

Martin D. RICH and Norman I. Rich, General Partners of Tri–R By Products, an Iowa General Partnership, Plaintiffs,

v.

AIR PARTNERS, INC., MTH Holdings, Inc., Miller Tabak Hirsch & Co., MTH Co., LDH Partners, SLT–II, Inc., (formerly SLT Inc.), JDM Inc., VII Partners, Limited Partnership, Jeffrey D. Miller, Jeffrey S. Tabak, Susan L. Tabak, Gary D. Hirsch, Eugene A. DePalma, Richard Meli, James A. Lash and John Does 1 through 50, Defendants.

Nos. 91 Civ. 3451 (SWK) (JCF), 92 Civ. 1470 (SWK) (JCF).

United States District Court, S.D. New York.

Oct. 23, 1995.

1. Federal Courts ⚖12.1

917

Charles M. Carberry, Marc S. Kirschner, Robert W. Gaffey, Marla S.K. Gale, Jones, Day, Reavis & Pogue, New York City, for plaintiffs in No. 91 Civ. 3451.

Neal M. Goldman, Mark H. Jackson, Philip Raible, Squadron, Ellenoff, Sheinfeld & Sorkin, New York City, for plaintiffs in No. 92 Civ. 1470.

Louis C. Lustenberger, Jr., Alan B. Howard, Christoph C. Heisenberg, Donovan Leisure Newton & Irvine, New York City, for defendants.

### MEMORANDUM OPINION AND ORDER

FRANCIS, United States Magistrate Judge.

The popularity of leveraged buyouts reached its zenith in the 1980's, but the legal fallout from these transactions continues to descend on the courts. In the simplest terms, a leveraged buyout is the purchase of a company using its own assets as security for financing the acquisition. The consolidated cases here arose from the buyout of the Van Dusen Airport Services Company ("VDAS") in 1988. The plaintiffs are holders of senior subordinated notes issued by VDAS in 1987. In 1990, VDAS ceased making payments of interest and principal on the notes, and the plaintiffs commenced these actions, contending that the leveraged buyout constituted a fraudulent conveyance.

The plaintiffs contend that the transfer of VDAS's assets was an actual fraudulent conveyance in that it was accomplished with the intent to avoid the payment of creditors. They further claim that the buyout was a constructive fraudulent conveyance because the transfer was not made for fair consideration and rendered VDAS insolvent, unable to pay its debts as they came due, and without adequate working capital. The plaintiffs named as defendants the purchasers of VDAS, VDAS itself, and the prior owners who profited from the sale of their interests. As will be discussed in more detail below, a settlement was reached during the pendency of the action between the plaintiffs on one hand and VDAS and its new owners on the other.

The claims against the remaining defendants were tried before me on consent of the parties pursuant to 28 U.S.C. § 636(c). This opinion constitutes my findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

*Background*

### The Company

In January 1986, Miller Tabak Hirsch & Co., a group of investors including defendant Gary Hirsch, purchased a controlling interest in Van Dusen Air Incorporated ("VDAI"), a multifaceted aviation company. (Tr. 906–8, 914).[1] The following November, VDAI sold its divisions involved in the manufacture and sale of aircraft parts and engine overhaul to Aviall of Texas. (Tr. 910–12; PX 2 at 200086).[2] At the same time, VDAI transferred its fixed-base operations ("FBO") business to VDAS, a partnership whose principal owner was Mr. Hirsch. (Tr. 910–11). FBOs are airport-based businesses that provide fuel, maintenance, hangaring, and other services to aviation customers including companies that operate their own corporate aircraft. At the time VDAS was formed, it operated FBOs in (1) Minneapolis, Minnesota, (2) Lexington, Kentucky, (3) Columbus, Georgia, (4) Corpus Christi, Texas, (5) Anchorage, Alaska, (6) Boston, Massachusetts, (7) Detroit, Michigan, and (8) Atlanta, Georgia. (PX 2 at 200102). The operations in

---

**1.** "Tr." refers to the trial transcript.

**2.** "PX" refers to the plaintiffs' trial exhibits, while "DX" refers to the defendants' trial exhibits.

Atlanta and Detroit were not full-service FBOs, but rather locations where VDAS had a contract for fueling a major air carrier. (Tr. 1452; PX 2 at 200102; DX 147 at M0002076–77, M0002105–06).

From the outset, defendant Eugene De-Palma was VDAS' Chief Executive Officer, and defendant Richard Meli was its Chief Operating Officer. (Tr. 914). They expanded the operation of VDAS by acquiring eight additional FBOs at five airports between June 1987 and May 1988 at a total cost of approximately $27.1 million:

| FBO | Date of Acquisition | Location | Price Paid ($mm) |
| --- | --- | --- | --- |
| Des Moines Flying Service | June 1987 | Des Moines, IA | $4.3 |
| Nashville Jet Center | June 1987 | Nashville, TN | 4.3 |
| Million Air | Oct. 1987 | Cleveland, OH | 2.3 |
| Tennessee Jet Corp. | Dec. 1987 | Nashville, TN | 4.0 |
| Milwaukee Aero Dyne | Dec. 1987 | Milwaukee, WI | 1.0 |
| Nashville Aviation Services | Jan. 1988 | Nashville, TN | 3.2 |
| Cedar Rapids | Jan. 1988 | Cedar Rapids, IA | 0.6 |
| Milwaukee Aero Services | May 1988 | Milwaukee, WI | 7.4 |

(Joint Pre–Trial Order ("PTO"), Stip.Facts ¶ 21; DX 147 at M0002039).

For each FBO purchased, VDAS formulated an acquisition analysis that examined the FBO's historical financial performance, made adjustments based on consolidation into the VDAS chain, and projected earnings for the FBO. (DX 45, 46, 55, 61, 75). In general, VDAS anticipated doubling the earnings of the newly-acquired FBOs, since it had achieved similar results when it had previously purchased bases. (DX 61). VDAS also planned to upgrade and reorganize the operations at its new FBOs. For example, it intended to dispose of the charter and part sales businesses at Des Moines and focus on more profitable fueling and hangaring operations. (Tr. 917–20). At Nashville, VDAS planned to consolidate its three FBOs, renovate the premiere terminal facility known as the "Mansion," and reallocate hangar space to benefit its major customer, Northern Telecom. (Tr. 921–28). VDAS also anticipated capital improvement and consolidation of its two bases in Milwaukee as well as improvements at Cedar Rapids. (Tr. 932–37).

*The Plaintiffs' Investment*

In March 1987, in order to pay off existing debt and finance its expansion, VDAS issued twelve percent senior subordinated notes due in 1997 and valued at $50 million (the "twelve percent notes"). Interest on the notes would be payable each March 15 and September 15, beginning in September 1987. Each note was marketed in a "Unit" together with a Contingent Payment Obligation ("CPO"). A holder of a CPO would be entitled to a payment upon the occurrence of certain "triggering events" such as a merger of VDAS with another entity or a public offering of its partnership interests. (DX 7 at 02128–02132).

James T. Swanson, Senior Vice President and portfolio manager for Massachusetts Financial Services and investment advisor to the plaintiffs MFS/SUN Life Trust–High Yield Series, Massachusetts Lifetime Financial High Income Trust, and Lifetime High Income Trust (collectively, "MFS"), investigated the suitability of the investment. (Tr. 27–28, 38). MFS had previously invested in

14.5 percent private placement bonds issued by VDAI. (Tr. 36; DX 4). Mr. Swanson recommended that MFS now buy the VDAS units, noting in part that the company was an ideal candidate for a leveraged buyout. (DX 6).

Ultimately MFS purchased approximately $4 million of the twelve percent notes and the associated CPOs (PTO, Stip.Facts, ¶ 23). At the same time, plaintiffs Martin D. Rich and Norman I. Rich bought a total of $200,000 of the twelve percent notes and CPOs for NR Investment Associates and MR Investment Associates, partnerships made up of their respective family trusts. (Tr. 709–10). These entities subsequently transferred the investments to Tri–R By Products, a partnership between Martin and Norman Rich. (Tr. 709–10).

*The Leveraged Buyout*

In March 1988, Mr. Hirsch first proposed the sale of VDAS. (Tr. 943–45; DX 107). As the initial step in a buyout, the limited partners of VDAS would exchange their interests for partnership interests in VII Partners, L.P. ("VII"). Air Partners, Inc. ("API"), which was the managing general partner of VDAS, would become the managing partner of VII. (DX 107).

Mr. Hirsch engaged Salomon Brothers, Inc. to prepare an offering memorandum for the sale of VDAS. (Tr. 948). This Memorandum reviewed VDAS' past performance and set forth cash flow projections developed by the company's management. (DX 108).

Initially, Mr. DePalma and Mr. Meli were asked about their interest in purchasing VDAS. Mr. DePalma declined because he preferred to remain as an operator rather than an owner, and Mr. Meli lacked the necessary capital. (Tr. 900–01; Deposition of Richard J. Meli dated Feb. 25, 1992 at 96). Other parties did express interest, including a partnership consisting of former United Airlines Chief Executive Officer Dick Ferris and golfer Arnold Palmer, Triton Energy Corporation, Bessemer Trust Company ("Bessemer"), the Wesray investment banking firm, and Mike Rosenthal, a former partner of Wesray. (Tr. 874, 950). The most serious inquiries were made by Bessemer and Mr. Rosenthal. Bessemer representatives discussed a potential transaction in the range of 100 to 110 million dollars. (Tr. 951–52). Mr. Hirsch and his partners rejected that bid because Bessemer was unwilling to give them a preferred interest in the new entity and because it sought indemnification with respect to any preexisting general partner liabilities. (Tr. 952–53). Mr. Rosenthal also discussed a price of approximately $105 million, together with a $5 million preferred interest for Mr. Hirsch's group. (Tr. 953). He indicated a desire to have Mr. DePalma continue to run the operation, and he had identified a likely source of financing. (Tr. 874–75, 953–55).

However, before any deal with Mr. Rosenthal could be consummated, Marc Bergschneider, with the financial backing of Wesray, began to pursue the opportunity. (Tr. 955–57). They formed an entity called MAST Resources, Inc. ("MAST") and prepared a memorandum for submission to banks in order to secure financing. (Tr. 95). MAST also developed its own projections of VDAS' future cash flow, which will be discussed below. (Tr. 127–28).

Ultimately, VDAS accepted MAST's proposal for a buyout. In its financing memorandum in May 1988, MAST identified the purchase price as $122 million. (DX 124 at 3). Houlihan Lokey Howard & Zukin ("Houlihan Lokey"), an investment banking firm that furnished a solvency opinion to MAST on August 5, 1988, calculated the purchase price as approximately $124 million. (DX 173 at 1). At trial, Mr. Bergschneider estimated the amount paid for VDAS as between $110 and $120 million. (Tr. 122). This consisted of $105 million of long-term debt assumed by VDAS together with the preferred stock retained by the sellers, which was valued at between $5 and $15 million.

On May 9, 1988, API, VII, and FBO Acquisition Corp. ("FBOAC") entered into a Purchase Agreement for the sale of VDAS. (PX 41 at 100008 & Tab 4; PX 34). FBOAC was an entity formed by MAST. (PTO Stip. Facts ¶ 31). On August 2, API authorized the transfer to VII of its partnership interest in Riverside Acquisition Corp. ("RAC"), a limited partnership that held stock in Penn

Traffic Co. (PX 41, at 100009 & Tab 13 at 100237). In return for the partnership interest, VII gave VDAS a promissory note for $2.7 million that would be cancelled upon consummation of the LBO. (PX 40; PX 36 § 6.6 at 46).

On August 5, all limited and general partners of VDAS except API exchanged their partnership interests in VII, and VII became a general partner in VDAS. At the same time, VII and API, as sellers, and FBOAC and Jet Services, L.P. ("Jet"), another MAST entity, entered into an Amended and Restated Purchase Agreement. (PX 36).

The LBO closed on August 8, 1988.[3] It was financed primarily by loans from Security Pacific National Bank ("Security Pacific"), consisting of (i) a $45 million term loan (plus an additional $10 million revolver) (the "Senior Credit Facility"); and (ii) Senior Subordinated Notes in the principal amount of $10 million. The Senior Credit Facility was secured by all of VDAS' assets. (DX 204; PX 41 at Tabs 65–83). Of the proceeds of the loan, Security Pacific retained $1,757,917 in fees, $22,790,999 went to VII, and $30,451,084 went initially to VDAS. From the funds that it received, VDAS paid off $27,058,663 in existing debt, paid $550,000 in legal fees, and transferred $1,630,000 to MAST. VDAS thus retained $1,212,421 in cash from the loan. (PX 44, 78).

The proceeds of the LBO were distributed to the partners in VII. Among the individual defendants, Mr. Hirsch received $2,030,793 individually, and millions of dollars were transferred to entities in which he had an equity interest (PX 44; Tr. 999–1006). Mr. DePalma received $1,064,153, and Mr. Meli, $212,830. (PX 44).

At the same time, the defendants retained some investment in VDAS. VII continued to hold a ten percent limited partnership interest (PTO, Stip.Facts ¶ 31), as well as a preferred partnership interest with a face value of $15 million. (Tr. 958–59). Mr. DePalma and Mr. Meli also invested $150,000 each in VDAS at the time of the LBO. (Tr. 750–51, 875).

Prior to closing, the sellers offered to make certain payments to bondholders in connection with the LBO. First, the sellers agreed to redeem the CPO portion of the Units while at the same time maintaining that the LBO was not a "triggering event" requiring redemption. (Tr. 31, 957–58; DX 148). MFS tendered all of its CPOs and, at $75 per unit, received $304,500. The Rich plaintiffs likewise accepted the offer and received a total of $15,000. In addition, in order to compensate holders of the twelve percent notes for any decline in value resulting from the LBO, VDAS made a payment of $20 per note. (Tr. 33–34, 726, 967–68; DX 166. PTO Stip.Facts ¶ 33). These payments amounted to $81,200 for MFS and $4,000 for the Rich plaintiffs. (DX 517; PTO Stip. Facts ¶ 34).

*The Demise of VDAS*

At the first VDAS board meeting following the LBO, it was reported that earnings had fallen short of the projections for the month of July. This was attributed to fluctuating maintenance and equipment sales. (PX 19 at M0003929). By the end of August, Mr. Meli advised Mr. Bergschneider that operations were performing significantly below target relative to pre-LBO projections by MAST. He attributed this shortfall to the failure to take certain operating improvement measures in August, the failure to realize certain "upside potential" items, and an overall volume of business that was below expectations. (PX 17 at 1).

Accordingly, on August 30, Mr. Meli requested permission to draw down $1.25 million of the revolver to allow VDAS to pay its trade debt more quickly and to provide an operating "cushion" of $250,000. At this time, Mr. Meli estimated that VDAS had cash available of $500,000 beyond allowance for normal working capital needs. He also anticipated that an additional $3 million would be drawn down to make interest payments on the twelve percent notes due on September 15. (PX 18).

VDAS did utilize the revolver to make the September 15, 1988 payments on the twelve percent notes. It also succeeded in reducing

3. The relevant transactions were all deemed to have taken place on August 1, 1988.

its accounts payable. (PX 20 at 202927). At the same time, management began to implement some of the strategies that Mr. Meli had previously identified as necessary to achieve projected earnings. (PX 20 at 202926–27). Nevertheless, on September 22, 1988, VDAS sought relief from certain of the covenants contained in its loan agreement with Security Pacific. (PX 20 at 202928). While acknowledging that cash flow had fallen short of projections, VDAS emphasized that its problems were temporary and that relief would not be necessary after the March quarter. (PX 20 at 20298).

VDAS did make the required payments on the twelve percent notes in March and September 1989. (PTO Stip.Facts ¶ 38). However, in January 1989 the company adopted an annual budget $3.4 million less than the final LBO projections. (PX 23). On January 23, the Chief Financial Officer of VDAS warned Security Pacific that it was "quite clear that the budgeted cash flow from operations [would] be insufficient to meet existing financial covenants." (PX 23 at S100957).

At the end of February 1989, VDAS again reported its financial condition to Security Pacific. It now estimated that annual cash flow for the period ending June 30, 1989 would fall short of the post-LBO projections by $2.7 million. (PX 24 at S101599, S101601). VDAS noted that the large majority of the bases were performing satisfactorily, but that Nashville and Milwaukee were not. (DX 266 at MV048052). VDAS also indicated that a new competitor had begun operations at the Lexington airport and would cost VDAS about $500,000 per year. (DX 266 at MV048057).

On September 22, 1989, VDAS announced that it expected that by the end of the month it would no longer be in compliance with certain covenants of its senior credit agreement. As a consequence, it anticipated that Security Pacific would prohibit further payments on the subordinated debt, including the twelve percent notes. (PX 28). Indeed, on March 15, 1990, VDAS was required to suspend payments on the twelve percent notes and in November 1990, the company was liquidated. (PTO Stip.Facts ¶¶ 38, 39).

*Contributing Factors*

The plaintiffs contend that VDAS was doomed from the moment the LBO was consummated. According to the defendants, VDAS remained a viable entity after the LBO but was subject to a series of unforeseen events that contributed to its demise.

The first such event was customer response to the imposition of a ramp fee by VDAS. This was a surcharge imposed on all customers using VDAS facilities, which would be offset by reduced fuel prices. (Tr. 816–18; DX 235). In theory, this change in pricing policy was designed as an incentive for customers to buy fuel from VDAS. In practice, it had adverse consequences. First, customers reacted negatively, especially in Nashville where the base lost eight of its primary customers to the competing FBO. (Tr. 819–22, 883, 888–89; DX 502 at Tab V, Exh. 18, 19). At the same time that VDAS was losing sales in Nashville, its competitor's sales were increasing. (DX 502 at Tab V, Exh. 19). Thus, Nashville's performance did not merely fail to meet projections; it actually declined. (Tr. 805–06; DX 323 at MV000470). To exacerbate the situation, Mr. Bergschneider was quoted in *Aviation International News* as stating that pilots who did not like the ramp fee could take their business elsewhere. (Tr. 1415–16). Moreover, the new pricing policy limited VDAS' ability to raise its fuel prices since it was committed to maintaining a discount for customers who paid the ramp fee. Accordingly, when fuel prices rose in early 1989, VDAS' profit margin on fuel sales was squeezed. (DX 294 at 12, 15).

A second major factor in VDAS's decline was the deterioration of maintenance revenues at Nashville. At first, Mr. Meli believed he had mistakenly overestimated earnings based on temporary revenue increases resulting from a policy change by an engine manufacturer. VDAS' Nashville base was a licensed maintenance shop for Garrett 331 engines. In 1987, Garrett extended the number of flight hours permitted between full engine overhauls, thus increasing the number of minor overhauls, or "hot sections," that would be performed. Mr. Meli initially felt that the increased revenue from hot sections

was a one-time phenomenon that he should not have included in projections. (Tr. 842). However, he now contends that the policy change permanently increased the number of hot sections to be performed and was properly factored into his projections. (Tr. 828–29).

The defendants attribute the loss of maintenance revenues at Nashville to the termination of Dean Dhom, who was the head of the maintenance facility at Nashville and former owner of Tennessee Jet Corp. (Tr. 826–27). Mr. Dhom was fired in September 1988, and his departure triggered the resignation of several key mechanics at Nashville. (Tr. 827, 879–81). The maintenance business at that FBO steadily deteriorated, resulting in the firing of Mr. Dhom's successor. (Tr. 826, 881).

The third significant event was the emergence of a competing FBO at Lexington. Sprite Flite was VDAS' largest fuel customer at that base. (DX 49 at MV009929). In 1987, Mr. Meli learned that Sprite Flite had acquired a lease to property adjacent to VDAS and had petitioned the airport for permission to open an FBO there. (Tr. 753). In November of that year, Mr. Meli and other VDAS employees met with Jack Baugh, the owner of Sprite Flite, in an effort to dissuade him from competing with VDAS. (Tr. 754–55; DX 277 at MV050664). VDAS argued that a second FBO would not be economically viable and that Sprite Flite's interests would be better served by buying fuel at a discount from VDAS. (Tr. 755). When Sprite Flite rejected these overtures, VDAS sought to remove Sprite Flite from its premises and Sprite Flite retaliated by threatening to challenge VDAS' operating lease and to bring an antitrust action. (Tr. 755–56; DX 277 at MV050664). This legal battle was avoided when the parties entered into a moratorium agreement dated January 6, 1988. By that agreement the parties suspended their legal disputes pending Sprite Flite's efforts to open an FBO at Lexington. (PX 10).

VDAS continued to believe that Sprite Flite would not proceed with this project. Management did not consider the traffic at Lexington sufficient to support two FBOs. (Tr. 754–55, 890). Furthermore, the Sprite Flite location was undesirable because it had no facility for a fuel farm. (Tr. 890). On July 1, 1988, Mr. Meli noted that Sprite Flite appeared to be "stalled" in its efforts to finance an FBO and expressed hope that the plans would soon be abandoned. (Tr. 765, 1505; DX 150 at CPM0005372).

They were not. Sprite Flite obtained the necessary financing and opened the competing FBO in March 1989. Ultimately, Spite Flite captured eighty-five percent of the transient business and fifty percent of the total business at Lexington. (Tr. 1408–10). At present, there is once again a single FBO at Lexington operated by a company known as Sun Jet. (Tr. 1410–11).

The final factor cited by the defendants as contributing to the failure of VDAS is management's deviation from previous business strategies. VDAS had planned substantial renovations to its facilities in Nashville and Milwaukee. (Tr. 927–29; DX 90, 91, 92, 97, 104). Prior to the LBO, VDAS had engaged engineers to draft plans for the "Mansion," the key structure at Nashville, but no construction had begun. (Tr. 1480–81; DX 104). VDAS had also planned to shuffle the location of various operations at Nashville. (Tr. 928). After the LBO, however, Mr. Bergschneider determined not to make the expenditures necessary to follow through on these improvements. (Tr. 836–37).

The defendants also argue that VDAS abandoned its proven policy of acquiring single-site FBOs. Mr. Bergschneider had discussed with Mr. Hirsch continuing to make such acquisitions, and the additional $10 million in senior subordinated financing from Security Pacific was available for such purposes. (Tr. 962–65). However, after the LBO, Mr. Bergschneider focused instead on the possibility of merging with another large FBO chain, but no such deal was ever consummated. (Tr. 877–78; DX 318, 322).

*The Projections*

Throughout the period relevant to this litigation, business decisions concerning VDAS—made by its management, by potential purchasers of the company, and by creditors—were based on budget projections. These projections were formulated first by

Mr. Meli and subsequently by MAST. Their reliability is a linchpin of this case.

In December 1987, Mr. Meli drafted the projections for VDAS's 1988 operating plan. In order to do so, he accumulated and analyzed budgets for each individual base prepared by the base and regional managers. (Tr. 898–99, 947; DX 49). On this basis, Mr. Meli estimated total 1988 earnings at $11 million,[4] a $2 million increase over 1987. (DX 50 at MV010476).

Mr. Hirsch and his partner James A. Lash suggested to Mr. Meli that the 1988 plan was overly optimistic with respect to Nashville. (Tr. 781–83). In his memorandum accompanying the plan, Mr. Meli acknowledged the validity of this point, but concluded that because of the lack of operating experience at Nashville, no refinement of the projection was warranted. (DX 50 at MV010468).

In March 1988, Mr. Meli increased the projected annual earnings for VDAS from $11 million to $14.4 million. (DX 108 at 200051). This change reflected the acquisition of new FBOs in late 1987 and early 1988 and anticipated that VDAS would be able to double the earnings of the newly acquired bases as it had done with prior acquisitions. (Tr. 949; DX 45, 46, 55, 61, 75). Mr. Meli projected VDAS's earnings into the future as follows:

March 1988 Projections .
(Dollars in Millions)

| 1988 | 1989 | 1990 | 1991 | 1992 |
|------|------|------|------|------|
| $14.4 | $15.7 | $16.7 | $17.7 | $18.8 |

(DX 108 at 200051). These projections were incorporated in an offering memorandum prepared by Salomon Brothers Inc. in order to attract buyers for VDAS. (DX 108).

The next projections were formulated not by Mr. Meli but by MAST. Taking Mr. Meli's $14.4 million figure as a starting point, MAST then made adjustments based on its own base-by-base review of the company. (Tr. 127–28). MAST also reformulated the projections from calendar year 1988 to fiscal year 1989. (Tr. 131). Finally, it took into account the acquisition of Milwaukee Aero

Services, which took place in May 1988. (Tr. 961–62, 991). MAST was aware that VDAS was falling short of the projections made in the 1988 operating plan. (Tr. 100–01). Nevertheless, MAST arrived at projected earnings of $17.3 million. (DX 124 at M0000487).

In June 1988, Mr. Meli and Mr. DePalma engaged in a base-by-base review of VDAS in connection with the financing of the impending sale. (Tr. 762; DX 134). Based on their evaluation, Mr. Meli prepared a new set of projections dated July 1, 1988. (DX 150). In this instance, Mr. Meli outlined three sets of figures, each based on somewhat different operating assumptions: The MAST Model, a model based on conservative expectations, and a model that he considered the most likely outcome. (DX 150 at CPM0005365).

With respect to each FBO, Mr. Meli indicated what expectations had to be met in order to meet the conservative projection as well as what additional potential had to be realized in order to achieve the most likely outcome. For example, for the Cleveland base, the most likely outcome projection was based on attracting two new corporate customers, a prospect that Mr. Meli considered "50/50." (DX 150 at CPM0005367–68). At Nashville, the conservative estimate required VDAS to raise certain prices and relocate its piston maintenance program. (DX 150 at CPM0005368–69). The most likely outcome was dependent upon increasing retail fuel volume, providing ground handling services for airlines, building rental parking, and providing new hanger space for Northern Telecom, the major customer. (DX 150 at CPM0005369). Mr. Meli acknowledged disappointing results at Des Moines and the difficulty of taking actions that would alter the situation significantly. (DX 150 at CPM0005370). For Milwaukee, the conservative projection depended upon raising fuel prices and hangar rental rates. Beyond that, Mr. Meli identified "upside potential" of $250,000, consisting of $150,000 if Northwest Airlines doubled recently added flights to that airport and $100,000 from rental of office space made available by the integration

---

4. "Earnings" are earnings before depreciation, interest amortization, and taxes ("EBDIT" or "EBITDA"). In the December 1987 projections, EBDIT for 1988 is arrived at by subtracting overhead costs of $2.6 million from total cash flow of $13.6 million.

of operations. However, the most likely forecast assumed realization of $150,000 of this potential, not of the full amount. (DX 150 at CPM0005368).

In sum, Mr. Meli's most likely outcome projection was less than the MAST model projection for Minneapolis, Des Moines, Corpus Christi, Anchorage, Boston, and Cleveland. It exceeded the MAST estimates for Milwaukee, Nashville, Columbus, and Detroit, and was approximately equal to MAST's forecasts for Cedar Rapids, Lexington, and Atlanta. Where MAST had projected annual earnings of $17.3 million for VDAS for fiscal year 1989, Mr. Meli's conservative projection was $16.1 million and his most likely outcome forecast was $16.8 million. (DX 150 at 0005365).

Based on the most likely outcome figures calculated by Mr. Meli, VDAS created Final LBO Projections used to obtain financing for the transaction. They forecast cash flow through 1992 as follows:

### Final LBO Projections
(Dollars in Millions)

| | 12/31/88 | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|---|
| EBDIT | 15.1 | 17.0 | 18.5 | 20.0 | 21.7 |

(DX 179 at 3).

The figure for 1989 was obtained by adjusting Mr. Meli's $16.8 million number for fiscal year 1989 to calendar year 1989, using a projected annual growth rate of close to 8.5%. The same growth rate was then applied in order to project each year into the future. (Tr. 814–16; DX 164, 167). The 8.5% rate was based on the fact that VDAS operated at 20% earnings/revenue margin. Accordingly, a 1% real price increase would result in a 5% increase in earnings. In addition, a 1% increase in revenues would generate a 2% increase in earnings, while any increase for inflation would be reflected proportionately in earnings. (Tr. 813–16; DX 167). Mr. Meli then assumed an annual inflation rate of 3–4%, annual growth in revenues of 1–2%, and annual price increases of 0.5%. This resulted in projected annual growth in earnings of between 7.5% and 10.5%. (Tr. 816; DX 164).

These projections were made in an environment where the Federal Aviation Administration was forecasting 4% annual real growth in the turbojet and turboprop industries in connection with which VDAS did the vast majority of its business. (Tr. 816, 938–39; DX 108 at 6–7, 20, DX 507, DX 513). At the same time, FBO chains including Combs Gates and Butler Aviation were projecting higher rates of growth for their own earnings. (Tr. 1400–01, 1544–45; DX 502 at 202707, PX 82 at 38). On the other hand, the projections did not account for any potential economic downturn when decreases in volume or real prices would have similarly magnified negative effects on earnings. (Tr. 842, 849).

*Contemporaneous Valuations*

Apart from VDAS and MAST, a number of independent entities analyzed the company to ascertain its value or solvency. One, of course, was Security Pacific, which conducted a due diligence review in connection with its financing of the transaction. David Risdon, a Vice President, participated in this review along with other employees of Security Pacific. They visited a number of the FBOs and met with VDAS management. (Deposition of David L. Risdon dated April 27, 1992 at 92–97). They also analyzed VDAS's financial projections in relation to the available historical data. (Risdon Dep. at 93, 97–98, 197).

Security Pacific did not place unquestioning reliance on the VDAS projections. (Risdon Dep. at 257). Rather, it conducted a sensitivity analysis, altering the assumptions utilized by VDAS to determine the effect on the forecast. (Risdon Dep. at 108–09, 115, 118). As a result of this procedure, Security Pacific concluded that VDAS' projection of $17 million in earnings for 1989 was overly aggressive, and it adopted a figure of $15.7 million as more realistic. (DX 137 at S102984).

Nevertheless, Security Pacific agreed to finance the LBO with a term loan of $45 million and a revolving credit line of $10 million. It also provided VDAS with an additional $10 million loan at the same subordinated level as the twelve percent notes. (PTO Stip.Facts ¶ 32). Security Pacific proceeded with the transaction despite the fact that it had historically rejected fifty to seven-

ty percent of all requests for LBO financing. (Risdon Dep. at 90).

Bankers Trust Company also committed to finance the LBO. (DX 141). There is no evidence in the record of specific steps taken by Bankers Trust in conducting any due diligence review, but it may be presumed that such a commitment would not be made cavalierly. Ultimately, MAST chose to accept Security Pacific's offer because the financing costs were lower. (Tr. 135).

The financial condition of VDAS at the time of the LBO was also analyzed by Arthur Young & Company ("Arthur Young"), the company's outside accountants. First, Arthur Young examined VDAS' consolidated balance sheet as of August 1, 1988. It concluded that the balance sheet fairly reflected the financial condition of VDAS in conformity with generally accepted accounting principles. (DX 171 at MV026167). That balance sheet reflected assets of $131,385,000, total debt of $115,097,000, and partnership equity in the amount of $16,288,000. (DX 171 at MV026168). Since the balance sheet incorporated the LBO transaction, it suggested that VDAS would be somewhat more than $16 million "in the black" immediately after the LBO.

In conducting its analysis, Arthur Young determined that the projections made by VDAS management were reasonable. (Tr. 1071–72). However, Arthur Young did not formally audit, examine, or review those projections. (Tr. 1085). Because it did not consider VDAS to be facing imminent insolvency, Arthur Young conducted its analysis on a going concern rather than a liquidation basis. (Tr. 1069–71).

Arthur Young also provided two other valuations of VDAS. The first, submitted on May 25, 1988, was for the purpose of obtaining financing for the LBO. (DX 147, Tab I at M0002135). Arthur Young utilized the discounted cash flow method of valuation. (Tr. 1011–12). Pursuant to this method, the analyst projects the cash flow of the company for some period into the future and then determines the terminal value of the business at the conclusion of the projected period. Finally, the analyst discounts both the projected cash flow and the terminal value back to the present.

Arthur Young used VDAS' projections as the basis for its analysis. It tested the reasonableness of these forecasts by comparing them to industry growth figures and by conducting field due diligence. (Tr. 1013–14). Nonetheless, in its opinion letter Arthur Young stated that it had "not examined the forecasted data or the underlying assumptions...." It also indicated that it was offering no opinion as to the solvency of VDAS. (DX 147, Tab I at M0002135).

Arthur Young took VDAS's forecasted cash flow and projected it forward for a period of seven years at a growth rate of 8.5%. (Tr. 1014–15; DX 164, 167). It then took the final year of the forecast horizon and multiplied it by a growth factor to obtain a terminal value. The rate of growth chosen was zero, meaning that there was an assumption of no price increases, no volume increases, and no inflation in terms of added value. (Tr. 1017–18). Arthur Young then used the capital asset pricing model to derive a discount factor of 11.5%. (Tr. 1019–22). Applying that discount rate to the cash flow projections and the terminal value, Arthur Young concluded that VDAS would have a value of between $127 million and $144 million as of June 30, 1988. (Tr. 1022; DX 147, Tab I at M0002136).

In a letter dated August 5, 1988, Arthur Young performed a further valuation of VDAS in order to allocate the LBO purchase price to partnership interests for tax purposes. (Tr. 1023–24; PX 5). Using a different methodology, it concluded that the company had a value of $144 million. (PX 5). Because of the tax implications, in this instance Arthur Young sought to attribute as much value as possible to tangible assets. (Tr. 1030).

The last outside entity to analyze VDAS prior to this litigation was Houlihan Lokey, which was engaged by MAST to provide an opinion as to the solvency of VDAS for the benefit of Security Pacific. (Tr. 1134; DX 173). To do so, it used three different methods of valuing the company.

The first was a discounted cash flow method similar to that utilized by Arthur Young. Houlihan Lokey started with projected earnings figures forecast by VDAS management. It adopted the figure of $17.221 million for calendar year 1989. (Tr. 1153–54; DX 169 at 19). This was done after Houlihan Lokey personnel had visited five key FBOs, reviewed historical and projected financial data, and interviewed VDAS management. (Tr. 1135–37, 1158; DX 168; DX 169 at 1).

Houlihan Lokey then projected earnings for five years using an annual increase in revenues of 6.5% (or about 8% for earnings). (Tr. 1162; DX 169 at 19). It next calculated a terminal value and applied alternative growth rates of 3%, 5%, and 7% to that value. (Tr. 1161; DX 169 at 19). Finally, Houlihan Lokey applied a discount rate ranging from 13% to 15%, with the higher discount rates linked to the higher growth rates for the terminal value. (Tr. 1161; DX 169 at 19). On the basis of this analysis, Houlihan Lokey concluded that VDAS had a total asset value ranging between $119 million and $131.2 million. (Tr. 1162; DX 169 at 4, 19, DX 170 at 1).

Houlihan Lokey also utilized the market multiple method of valuation. This requires the analyst to (1) identify comparable public companies, (2) ascertain the ratio between each company's earnings or cash flow and the value of its stock, (3) "average" these ratios to obtain an industry multiplier, and (4) apply this multiplier to the subject company's cash flow to estimate its value. (Tr. 1141–42).

In order to obtain information on comparable companies in this case, Houlihan Lokey started with standard industrial classification codes to identify airport service businesses. (Tr. 1142). It then looked at individual characteristics of each company and selected four as similar to VDAS: AAR Corp., Aero Systems, Inc., Jetborne International, Inc., and North American Ventures, Inc. (Tr. 1142–43; DX 169 at 16). Applying the derived multiple to VDAS's historical EBDIT, Houlihan Lokey obtained a valuation of $132.3 million. (DX 169 at 4). Both the multiplier and the valuation varied, however, depending on

what measure of earnings was utilized. Thus, applying the multiplier for EBIT[5] resulted in a valuation of $102.3 million. (DX 169 at 4).

The last method employed by Houlihan Lokey was the comparable transaction analysis. This involved identifying the sale of a company similar to VDAS, determining how the sale price related to that company's earnings, and applying the same multiple to VDAS' earnings. In this case, Houlihan Lokey identified the sale of Butler Aviation as a similar transaction. (Tr. 1147–48). By analyzing that transaction, it determined that the sale price was 10.5 times Butler's EBDIT. (Tr. 1148; DX 169 at 22). Again, using multipliers derived from different earnings benchmarks, Houlihan Lokey determined a valuation range for VDAS of between $111.5 million and $134.5 million. (DX 169 at 4, 22).

Based on the value derived from each of the methods used, Houlihan Lokey concluded that VDAS had a total asset value of approximately $125 million. (DX 169 at 4). Because VDAS' pro forma debt was calculated to be $105.4 million, Houlihan Lokey determined that the company was solvent by $19.6 million or about 15.7% of its total assets. (Tr. 1163; DX 170 at 1).

Houlihan Lokey also ran a sensitivity analysis, altering assumptions to determine the effect on VDAS' solvency. (Tr. 1167–69). It concluded that if revenue growth were decreased by 5% and EBDIT margin by 1%, VDAS would still have adequate working capital and would be able to pay off its debts. (Tr. 1169; DX 170 at 16).

*Expert Witnesses*

VDAS' financial condition was also analyzed after-the-fact by expert witnesses in connection with this litigation. Because the defendants' experts agreed generally with the contemporaneous analyses of VDAS already discussed, I will address their evidence first.

#### A. *W. Stephen Dennis*

W. Stephen Dennis is President of FBO Resource Group ("FRG"), a consulting busi-

---

5. "EBIT" is earnings before interest and taxes.

ness that provides services to the FBO industry, including valuations of FBOs. (Tr. 1238–40). Prior to forming FBO Resource Group, Mr. Dennis had been Vice President of Combs Gates and then Jet Aviation, both FBO chains. (Tr. 1243, 1252–53). In that capacity he had experience valuing FBOs for potential acquisition. (Tr. 1250–53).

In this case, Mr. Dennis was engaged by the defendants to provide a valuation of VDAS as of the date of the LBO. He did this using a comparable company method. FRG collects information on the FBO industry generally and on the details of each FBO sale. (Tr. 1240–41). It can thus derive a multiplier for any transaction representing the relationship between the target's cash flow and the sales price. By taking the multiplier for comparable companies and applying it to the subject company's cash flow, FRG can obtain a value for the subject.

In this case, Mr. Dennis began with VDAS' operating results for the first seven months of 1988. (Tr. 1262; DX 476). He then annualized these figures. Although VDAS had acquired FBOs during this period, Mr. Dennis made no upward adjustment in anticipation of greater earnings as the new bases became integrated. (Tr. 1267–68). After recasting VDAS' figures to conform to the categories in his model, Mr. Dennis determined that VDAS' annualized EBITDA for 1988 was $12,314,000. (Tr. 1265; DX 499A at Table 15).

Mr. Dennis then projected VDAS' earnings three years forward. He assumed 5% real growth rate for revenues, based in part on FAA forecasts of 4% growth and in part on the views of other FBO operators who were projecting 10–12% growth during this time. (Tr. 1272–74). Mr. Dennis also assumed a 2½ growth rate for costs. (Tr. 1275–76). Because of the compounding effect of this rate, the actual growth rate that Mr. Dennis projected was between 11% and 12%. (Tr. 1275; DX 499A at 15).

Applying the growth rate to the 1988 annualized figures, Mr. Dennis projected EBITDA of $13,960,711 for 1989, $16,173,025 for 1990, and $18,474,263 for 1991. (DX 499A at Table 15). He then took the arithmetic average of these three years in order

to account for present value considerations. (Tr. 1277–78). This resulted in an EBITDA figure of $16,202,666. (Tr. 1279; DX 499A at 51).

Mr. Dennis then sought comparable companies from which to derive a multiplier. Because of the volatility of the corporate takeover market, he confined his search to a period within two years of the VDAS LBO. (Tr. 1280–81). The two most comparable transactions that Mr. Dennis identified were the sale of Combs Gates to AMR Services and the sale of Butler Aviation to North American Ventures. These were similar to the VDAS transaction because they involved FBO chains. (Tr. 1281–83). In each of these two sales, the purchase price was more than eleven times EBITDA. (Tr. 1283; DX 499A at 49). In his list of comparables, Mr. Dennis also included six transactions involving single-site FBOs. These sales involved lower multipliers, so that when they were averaged with the multipliers for Combs Gates and Butler the resulting multiplier was 9.3. (DX 499A at 45).

Mr. Dennis then took this multiplier and adjusted it to take into account specific characteristics of VDAS' bases. He made a downward adjustment of 1.15 because of negative factors associated with the Anchorage, Cedar Rapids, Cleveland, and Corpus Christi FBOs. That led to a low-end multiplier of 8.15. Mr. Dennis also adjusted the multiplier up by 2.00 to account for unique potential at Des Moines, Lexington, Milwaukee, Minneapolis, and Nashville. Added to the 8.15, this resulted in a maximum multiplier of 10.15. The average multiplier, then, was 9.15. (Tr. 1289–94; DX 499A at Tab X).

As a final step, Mr. Dennis multiplied the average projected earnings figure of $16,-202,666 by each alternative multiplier. This yielded a value of $132,052,000 with the low-end multiplier, a value of $148,254,000 with the average multiplier, and a value of $164,-457,000 with the high-end multiplier. (Tr. 1262, 1294; DX 499A at 51).

In addition to performing this valuation, Mr. Dennis opined that VDAS would generate sufficient earnings to meet its obligations over the three year period that he projected.

(Tr. 1294–95; DX 499A at 51). He further stated that VDAS had been left with sufficient working capital, especially in light of the minimal capital requirements of businesses in this industry. (Tr. 1295–96; DX 499A at 51).

### B. *Thomas Comeau*

Thomas Comeau is a former President and Chief Executive Officer of Butler Aviation. (Tr. 1385–88). Currently he is President of Butler Airport Services as well as the principal of Comeau & Associates, a consulting firm for the FBO industry. (Tr. 1384–85). Mr. Comeau reviewed the projections prepared by VDAS and offered his opinion both on their reasonableness and on why they were ultimately not achieved.

First, Mr. Comeau examined VDAS's budgeting process and concluded that it was reliable. Specifically, he approved the "bottom-up" budget concept that relied upon aggregating projections for each FBO. (Tr. 1397–98; DX 502 at 14). Mr. Comeau next concluded that the projected EBITDA of somewhat more than $17 million was reasonable. In particular, he noted that this equalled 20.9% of revenue, a percentage similar to that VDAS had obtained in the past. (Tr. 1396–97; DX 502 at 15).

Next, Mr. Comeau analyzed the growth rate forecasted by VDAS. He observed that industry-wide forecasts for such categories as numbers of turboprop aircraft and business jets, hours flown, and fuel consumption were all quite positive. (DX 502 at 16). Within the industry, Combs Gates was projecting EBDIT growth at 11.5% through 1992, while Butler was projecting EBDIT growth at 15.1% for 1990–93. (DX 502 at 15). Mr. Comeau considered both companies comparable to VDAS. (Tr. 1399). Historically, VDAS had grown at a rate of 14.3% through 1988, but it was projecting future growth only at 8.2%. (Tr. 1400–01; DX 502 at 16). Thus, Mr. Comeau found VDAS' forecast for growth, as well as the resulting projections, to be reasonable. (DX 502 at 17).

Based on his review of available materials, Mr. Comeau also offered an opinion on the reasons for VDAS' failure. He focused on the three bases where VDAS fell short of its projections: Lexington, Nashville, and, to a lesser extent Milwaukee. (DX 502 at 18–22).

At Lexington, Mr. Comeau identified the emergence of Sprite Flite as the critical factor. However, he considered reasonable the prognosis of VDAS management that Sprite Flite would not enter the market, since the economics did not justify an additional base. (DX 502 at 19). Furthermore, Mr. Comeau found that Sprite Flite's market penetration was faster and deeper than would normally be the case, apparently because of VDAS' failure to respond appropriately. (DX 502 at 19).

According to Mr. Comeau, several factors caused the negative results in Nashville. First, with the termination of Dean Dhom and the subsequent resignation of several mechanics, VDAS lost substantial maintenance work. In 1989, for example, it did less than half the number of hot sections it had done in any prior year. (DX 502 at 19–20). Because of the failure to renovate the "Mansion" and the implementation of the ramp fee, VDAS lost business to competitors. Six base customers left and the customer survey rating of the FBO dropped dramatically. (DX 502 at 19–20). Indeed, although the Nashville airport delivered more retail fuel to general aviation in 1989 than it did in 1988, the benefits were reaped not by VDAS but by its competition. (DX 502 at 19).

At Milwaukee, VDAS failed to go forward with renovations to the outmoded facilities it had acquired from Aero Dyne. Mr. Comeau concluded that this, together with implementation of the ramp fee, caused VDAS to fall short of its projections for this base. (DX 502 at 21–22).

### C. *Dominic DiNapoli*

The third expert witness who testified for the defendants was Dominic DiNapoli, Co-National Director of the Corporate Recovery Services Group for the accounting firm of Price Waterhouse. (Tr. 1545–46). He was engaged to offer an opinion as to the solvency of VDAS, the adequacy of its capital following the transaction, and its ability to pay its debts as they matured.

Mr. DiNapoli employed a discounted cash flow analysis to determine the value of VDAS' assets. (Tr. 1552–53; DX 533 at 3). As a starting point, he used the final VDAS management projections for cash flow, including EBITDA of $17 million for 1989. (Tr. 1553; DX 533 at Exh. 4). He then applied a growth rate of 4.4%—equal to inflation at the time—to the terminal value. (Tr. 1554–55). Next, Mr. DiNapoli derived a discount rate to apply to the projected cash flow. He did this using the weighted average cost of capital method. (Tr. 1557–58). In part, this method required Mr. DiNapoli to determine the cost of equity for VDAS, taking into account the risk that an investor would associate with the industry. To do this, Mr. DiNapoli identified a comparable public company, Hudson General, and used it to derive a measure of the volatility of stocks in the industry. (Tr. 1558–64). He ultimately used a post-tax discount rate of 11.7%. (DX 533 at 5 & Exh. 2). This led to a valuation of VDAS prior to the LBO of $153,934,000. (DX 533 at Exh. 1). On that basis, Mr. DiNapoli opined that VDAS was solvent by approximately $57.1 million. (DX 533 at 5 & Exh. 3).

Mr. DiNapoli then adjusted his analysis to account for the LBO. That transaction did not alter the expected earnings. (DX 533 at 5–6). It did enhance cash flow, however, because of tax savings, and it changed the appropriate discount rate slightly to 11.5%. (Tr. 1565; DX 533 at 6 & Exh. 5). Mr. DiNapoli now calculated that the fair value of VDAS after the LBO was $164,674,000, and that its assets exceeded its liabilities by $42.1 million. (Tr. 1566–68; DX 533 at 6 & Exh. 6).

Mr. DiNapoli then tested this valuation by comparing its relation to EBITDA against similar multiples for sales of other FBO operators. (Tr. 1568–69). The multiple for VDAS was 11.28, as compared with 11.34 for Combs Gates and 10.14 for Aero Services. (Tr. 1569; DX 533 at Exh. 7). The similarity of the multiples provided corroboration for Mr. DiNapoli's figures. (Tr. 1569).

Next, Mr. DiNapoli compared VDAS' debt to equity ratio to that of comparable companies. He examined private companies identified as comparable by Mr. Dennis and the FBO Resource Group and determined that their debt to equity ratio averaged 4.5:1 in 1985 and 1.5 to 1 in 1990. (DX 533 at 7). Since VDAS' debt to equity ratio after the sale was 3.0:1, he concluded that it had adequate working capital. (Tr. 1571–73; DX 533 at 7).

Finally, Mr. DiNapoli examined VDAS' cash flow projections in relation to their debts for a period of seventeen months after the LBO. Although VDAS was expected to draw down its $10 million revolver in 1988, this debt could be paid in full from earnings in 1989. (DX 533 at 8). Mr. DiNapoli determined that through 1989 VDAS had the ability to meet its obligations as they came due. (Tr. 1573–74; DX 533 at 8 & Exh. 8).

### D. *Wilbur L. Ross, Jr.*

The first of the plaintiffs' experts was Wilbur L. Ross, Jr., a Senior Managing Director of Rothschild, Inc., an investment banking and investment management firm. (Tr. 154). Mr. Ross used a discounted cash flow analysis to perform a valuation of VDAS as of August 1, 1988.

Mr. Ross began with two alternative projections for calendar year 1988. The first was a combination of the actual results of the first seven months of 1988 together with the Final LBO Model forecast for the balance of the year. (PX 67 at 1). This yielded a projected EBITDA of $11,166,000. (PX 67, Att. at 1). The second projection was based on the Final LBO Model alone, and adopted a figure of $15,080,000 for EBITDA for 1988. (PX 67 at 1 & Att. at 1). Mr. Ross then took the mean of these two projections, $13,123,000, and used it as the base for his forecasts of succeeding years. (PX 67, Att. at 1).

Mr. Ross next applied growth rates ranging from 3% to 5% to the base year forecast. He also made one projection using 6% growth for each year except one, which was assumed to have zero growth due to recession. (Tr. 185–86; PX 67, Att. at 2–6). He projected EBITDA through 1993 and derived a terminal value for the company to which he applied multipliers of 5.5, 6.0, and 6.5. (PX 67, Att. at 2–6). These multipliers represented the range of premiums that, in Mr. Ross'

judgment, a purchaser would pay for VDAS. (Tr. 188). He then applied discount factors ranging from 14% to 17% to both the cash flow and the terminal values. (PX. 67, Att. at 2–6). These discount rates were chosen as the type of return a buyer would expect to achieve from what Mr. Ross characterized as a "pedestrian-type business." (Tr. 187).

As a result of this analysis, Mr. Ross ascribed to VDAS a value ranging from $72 million to $94.3 million. (PX 67, Att. at 2, 5). At most, he felt that a buyer might pay $85 to $90 million for VDAS (Tr. 188). Since the company had more than $100 million in liabilities following the LBO, Mr. Ross concluded that it was insolvent. (Tr. 189–90).

### E. *Richard Smith*

Richard Smith was the plaintiffs' second expert. Mr. Smith is Chief Executive Officer of R.H. Smith & Associates, a firm specializing in financial reorganization and restructuring services. (Tr. 290–91). Prior to his engagement in this case, Mr. Smith had analyzed VDAS on behalf of Security Pacific to determine why the company was not meeting its cash flow projections. (Tr. 299–301).

In this litigation, Mr. Smith used three methods to value VDAS. The first was a multiple of cash flow analysis. It involved obtaining cash flow for a single year and multiplying that number by a premium factor to obtain a final valuation. (Tr. 323–24).

In order to calculate cash flow, Mr. Smith began with the actual results for each of VDAS' FBOs for 1987. With respect to the FBOs recently acquired by VDAS—Des Moines, Nashville, Cleveland, Milwaukee, and Cedar Rapids—he relied upon their earnings in the last full year of operation prior to their acquisition. (Tr. 447). Mr. Smith then enhanced the earnings figures for the newly acquired bases by 25% to account for efficiencies expected from their integration into the VDAS chain. (Tr. 329–30, 447). This resulted in a total modified 1987 EBDIT of approximately $11 million. (Tr. 331; PX 49A at 1–7).

Mr. Smith then chose a cash flow multiple of 7.5. (PX 49A at 1–6). He selected this figure because it was consistent with both the cash flow multiple used in the Final LBO

Model and with the multiples at which VDAS was purchasing FBOs in 1987 and 1988. Further, it was a higher multiple than was used in subsequent proposed FBO purchases by VDAS. (Tr. 331–35; PX 49A at 1–6). Finally, Mr. Smith applied this multiple to what he now characterized as estimated 1988 cash flow, and arrived at a total valuation of $82,493,000. (Tr. 335; PX 49A at 1–6).

Mr. Smith's second method was a hybrid of cash flow analysis and purchase price. With respect to FBOs owned by VDAS prior to 1987, he used the same cash flow calculations he had in the first method and determined that these bases standing alone had a value of $50,048,000. (Tr. 338–40; PX 49A at 1–8). He then turned to the FBOs acquired in 1987 and 1988. They had been purchased by VDAS for a total of $27.1 million. Again, Mr. Smith enhanced this figure by 25% to account for their integration in the chain, arriving at a total value of $33,875,000 for these bases. (Tr. 341–42). Adding the values of the old and new bases, Mr. Smith reached a total value of $83,923,000 for VDAS using this method. (Tr. 342; PX 49A at 1–8).

In his third valuation, Mr. Smith used the discounted cash flow method utilized by other experts. He began with the modified 1987 figure of $11 million he had previously derived. He then increased that figure by a 6% growth factor for each succeeding year over a twenty-year period (but using only one-half of the 1988 amount due to the mid-year LBO). (Tr. 343–44; PX 49A at 1–9). He selected a 6% growth rate based on projected growth in general aviation of 1% plus inflation of up to 5%. (Tr. 347–48, 563–64; PX 49A at 1–9). Mr. Smith then discounted the cash flow for each year using a pre-tax discount rate of 20%. He derived this rate by adding the rate that VDAS paid on its debt, 13.24%, and some 6.76% for additional risk. (Tr. 581–82). After adding the terminal value multiplied by the 7.5 premium discussed above, Mr. Smith arrived at a total valuation of $80,585,000. (PX 49A at 1–9).

On the basis of these three sets of calculations, Mr. Smith concluded that VDAS had a value of approximately $82 million following the LBO. (PX 49A at 1–5). Initially, he

determined that this meant that it was insolvent by $28,129,000. (PX 49A at 1–1). At trial, however, he modified his opinion based on an adjustment for certain costs and concluded that the business was insolvent by about $26.5 million. (Tr. 314–15; PX 49A at 1–2).

Mr. Smith further opined that VDAS was not able to pay its debts as they became due. While it would be able to do so if the projections of the Final LBO Model were achieved and the revolving credit line were utilized, VDAS would experience problems as it fell short of forecasted cash flow. (Tr. 413–19, PX 74). For example, if it achieved 90 percent of its predicted cash flow, VDAS could pay its debts through 1994 but not thereafter. (Tr. 416; PX 75). If it achieved 80 percent of projections and utilized the revolver, it could meet its obligations only through 1990. (Tr. 417–27; PX 76). Finally, if VDAS' earnings tracked Mr. Smith's cash flow analysis, it could pay its debts through 1991 if it drew down on the revolver. (Tr. 418–19; PX 77).

Lastly, Mr. Smith testified that VDAS was left with insufficient working capital after the LBO. (Tr. 306). He noted that it had roughly $245,000 in capital at a time when it was doing more than $50 million in business annually. (Tr. 306).

*Discussion*

A. *Jurisdiction*

Federal jurisdiction in this case is predicated on the diversity of the parties. 28 U.S.C. § 1332. However, as a threshold matter, the defendants contend that the entire case should be dismissed because of settlement of the claims asserted against VDAS. Their argument begins with the premise that a fraudulent conveyance claim can exist only so long as there is an underlying debt that the plaintiffs seek to recover. In this case, the original obligation ran from VDAS to the plaintiffs as holders of the twelve percent notes. The defendants argue that when the claims against VDAS were settled, the debt was extinguished and the fraudulent conveyance claims were rendered moot. This, in turn, would deprive the Court of subject matter jurisdiction.

The plaintiffs respond that by failing to identify this issue in the pretrial order or raise it in prior summary judgment motions the defendants have waived the opportunity to raise it now. They further argue that the parties to the settlement agreement intended to preserve the plaintiffs' right to pursue this litigation. Finally, the plaintiffs contend that if the settlement were construed as foreclosing this litigation, it should be set aside on grounds of mutual mistake.

The plaintiffs' waiver argument may be quickly disposed of. If an action is moot, then the case or controversy requirement of Article III of the United States Constitution is not met, and a federal court lacks subject matter jurisdiction. *See Fox v. Board of Trustees of State University of New York,* 42 F.3d 135, 140 (2d Cir.1994); *New York City Employees' Retirement System v. Dole Food Co.,* 969 F.2d 1430, 1433 (2d Cir. 1992). Defects in subject matter jurisdiction cannot be waived and may be raised at any point in the proceedings. *Moodie v. Federal Reserve Bank of New York,* 58 F.3d 879, 882 (2d Cir.1995); *Fox,* 42 F.3d at 140.

The merit of the defendants' mootness argument turns on several principles. First, any fraudulent conveyance claim is derivative: it is predicated upon an underlying debtor-creditor relationship. If the debt is satisfied, the creditor no longer has a cause of action to recover assets conveyed by the debtor to a transferee. *See Allard v. DeLorean,* 884 F.2d 464, 466 (9th Cir.1989); *Weisenburg v. Cragholm,* 5 Cal.3d 892, 897, 97 Cal.Rptr. 862, 865, 489 P.2d 1126, 1129 (1971); *State of Rio De Janeiro v. E.H. Rollins & Sons, Inc.,* 299 N.Y. 363, 366–67, 87 N.E.2d 299, 300 (1949).

Second, the predicate debt can be satisfied by settlement of litigation between the debtor and the creditor. *See Allard,* 884 F.2d at 466; *cf. Cable Belt Conveyors, Inc. v. Alumina Partners of Jamaica,* 717 F.Supp. 1021, 1024 (S.D.N.Y.1989) (where subcontractor released general contractor from liability general contractor cannot sue owner for claims originating with subcontractor).

■ Nevertheless, under New York law [6] a settlement agreement that is not fully executed will not extinguish the underlying debt or bar a fraudulent conveyance claim. *Loblaw, Inc. v. Wylie,* 50 A.D.2d 4, 8, 375 N.Y.S.2d 706, 710 (4th Dep't 1975). "[A] compromise and settlement agreement, closely related to an accord and satisfaction, is not effective as an accord and satisfaction until fully executed." *Id.* (citation omitted).

■ Furthermore, the parties to a settlement can structure it in ways that will preserve the plaintiff's right to pursue related litigation. For example, a release may be limited to certain claims, allowing the parties to continue litigating those that remain. *See Kemp v. Perales,* 199 A.D.2d 320, 321, 604 N.Y.S.2d 268, 270 (2d Dep't 1993); *Herman v. Malamed,* 110 A.D.2d 575, 576–77, 487 N.Y.S.2d 791, 793 (1st Dep't 1985). Similarly, in the context of a fraudulent conveyance claim, a settlement with the debtor can both preserve the creditor's claims against transferees and provide that any amounts recovered be credited against the settlement. *See Loblaw,* 50 A.D.2d at 5–6, 375 N.Y.S.2d at 707–08.

■ The interpretation of a settlement agreement, as with any contract, turns on the intent of the parties. *See Federal Deposit Insurance Corp. v. Inhofe,* 16 F.3d 371, 374–75 (10th Cir.1994); *Resolution Trust Corp. v. Bildman,* 768 F.Supp. 3, 5 (D.D.C.1991); *Barrett v. United States,* 651 F.Supp. 611, 613 (S.D.N.Y.1986); *Loblaw,* 50 A.D.2d at 8, 375 N.Y.S.2d at 710. This principle extends to the construction of releases exchanged as part of a settlement. *See Barrett,* 651 F.Supp. at 613. At the same time, when a general release is negotiated by commercial entities in equivalent bargaining positions, it is construed against the releasor and the intent of the parties is ascertained from the language of the release. *See Middle East Banking Co. v. State Street Bank Int'l,* 821 F.2d 897, 907 (2d Cir.1987).

■ In this case, the plaintiffs received $94,000 in return for which they executed a general release in favor of VDAS, Mr. Bergschneider, MAST, and the entities created by MAST for purposes of effectuating the LBO. (DX 531 at ¶¶ 2, 6). The settlement released these defendants from

> any claim that any payment to any Releasee in connection with the August 1988 transaction referred to in the complaint constituted an unlawful, fraudulent or otherwise avoidable or voidable payment or conveyance, and all such claims shall be compromised and settled and dismissed with prejudice and without costs against Releases.

(DX 531 at ¶ 2). At the same time, the plaintiffs specifically reserved in the settlement agreement their claims against the other defendants, including Mr. Hirsch, Mr. DePalma, Mr. Meli, and Miller, Tabak, Hirsch & Co. (DX 531 at ¶¶ 4 & 5). Further, as consideration for the release, Mr. Bergschnieder was required to cooperate with the plaintiffs in the prosecution of this action by providing documents and giving testimony. (DX 531 at ¶ 8). If he failed to do so, the agreement could be voided. (DX 531 at ¶ 8).

Viewing the settlement agreement as a whole, it is evident that the parties to it intended that the fraudulent conveyance action proceed against the remaining defendants. That is what the reservation of rights specifically provides for. Moreover, had the settling parties expected that the entire fraudulent conveyance action would be extinguished, then the provision for Mr. Bergschneider's cooperation would have been meaningless.

The most coherent construction of the settlement, then, is that the parties simply intended to limit the settling defendants' liability to $94,000, not to extinguish the debt altogether. In a formal, if not a practical sense, VDAS would remain liable to the holders of the twelve percent notes so that the plaintiffs could pursue their claims against the non-settling defendants. The mainte-

---

**6.** The law of the forum state normally controls interpretation of a settlement agreement. *See In re Columbia Gas System Inc.,* 50 F.3d 233, 239 n. 10 (3d Cir.1995); *Hutton Construction Co. v.* *County of Rockland,* Nos. 93 Civ. 2465 (LAP) & 87 Civ. 4027 (LAP), 1993 WL 535012, at *3 (S.D.N.Y. Dec. 22, 1993).

nance of such an arrangement appears sufficient to preserve a creditor's claims against transferees even when claims against the debtors are settled. *See Loblaw,* 50 A.D.2d at 6, 375 N.Y.S.2d at 708.

■ Even if that were not the case, the claims against the non-settling defendants would survive in this case. As discussed above, the parties to the settlement clearly intended that the litigation against the transferees continue. If, because of the operation of law, it could not, then the settlement agreement is voidable as based upon mutual mistake. *See Touloumis v. Chalem,* 156 A.D.2d 230, 231–32, 548 N.Y.S.2d 493, 494–95 (1st Dep't 1989) (mutual mistake as to scope basis for voiding release, but no mistake demonstrated); *accord Wilson v. New York City Transit Authority,* 115 Misc.2d 1017, 1019, 454 N.Y.S.2d 962, 963 (Civ.Ct.Kings Co.1982), *aff'd,* 124 Misc.2d 839, 480 N.Y.S.2d 298 (App.Term 2d Dep't 1984). Not surprisingly, both MFS and the Rich plaintiffs indicated a willingness to undo the settlement if it were interpreted to foreclose the instant litigation. (Tr. 24–26).

Thus, if the settlement properly reserves the plaintiffs' rights, then the fraudulent conveyance claims against the transferees survive. If it does not, then the agreement is based on a mutual mistake and has been voided. In either event, the fraudulent conveyance claims are not moot and this Court has subject matter jurisdiction.

### B. *Fraudulent Conveyance Law and Leveraged Buyouts*

The plaintiffs' claims arise under the fraudulent conveyance statutes of New York, Minnesota, and Delaware. These laws trace their origins to the "statute of 13 Elizabeth," enacted by the English Parliament in 1571. Statute of Fraudulent Conveyances, 13 Eliz., ch. 5 (1571) (repealed by The Law of Property Act, 15 Geo. 5, ch. 20, § 172 (1925)). This law voided all transfers by debtors whose purpose was to hinder, delay, or defraud their creditors. *See Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 644–45 (3d Cir.1991), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); *Kupetz v. Wolf,* 845 F.2d 842, 846 (9th Cir.

1988); Raymond J. Blackwood, *Applying Fraudulent Conveyance Law to Leveraged Buyouts,* 42 Duke L.J. 340, 344 (1992).

With the advent of LBOs in the 1980's, there was initially some reluctance to apply traditional fraudulent conveyance law to these sophisticated commercial transactions. One law review article argued that "[a] firm that incurs obligations in the course of a buyout does not seem at all like the Elizabethan deadbeat who sells his sheep to his brother for a pittance." Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law and Its Proper Domain,* 38 Vand.L.Rev. 829, 852 (1985). In addition, courts were concerned that fraudulent conveyance laws would be transformed into a form of "insurance," providing unsecured creditors complete protection against the failure of the target company following an LBO. *See Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 500 (N.D.Ill.1988).

Nevertheless, courts now uniformly hold that fraudulent conveyance laws apply to LBOs. They recognize that even if the collusive aspects of the Elizabethan paradigm may not be present in an arm's-length LBO, creditors will suffer the same type of harm the laws were designed to remedy if the target is rendered insolvent. *See Mellon Bank,* 945 F.2d at 645–46.

> In evaluating the applicability of fraudulent conveyance laws designed to protect creditors' rights, it is essential to view the transaction or transactions in question from the perspective of creditors. A leveraged buyout (i.e., the sale of a corporation in which at least part of the purchase price is obtained through debt assumed by the corporation) such as the one at issue here can harm creditors in exactly the way fraudulent conveyance laws are designed to prevent.

*Crowthers McCall Pattern, Inc. v. Lewis,* 129 B.R. 992, 998 (S.D.N.Y.1991). Thus, it matters little whether a creditor is unable to recover because an individual debtor has secreted assets or because a corporate debtor has been gutted by former owners who reap the proceeds of an LBO.

Policy issues aside, there is nothing in the language of fraudulent conveyance statutes that renders them inapplicable to LBOs. *See Mellon Bank*, 945 F.2d at 646; *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 134 (Bankr.D.Mass.1989); *Wieboldt Stores*, 94 B.R. at 499. Accordingly, it is for the legislatures rather than the courts to determine whether to exempt leveraged buyout transactions from the fraudulent conveyance laws. *See Aluminum Mills Corp. v. Citicorp North America, Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 885 (Bankr.N.D.Ill. 1991). Indeed, after the emergence of LBOs, many state legislatures reenacted their fraudulent conveyance laws, but none carved out exceptions for LBOs. Blackwood, *supra*, at 355–56.

In our legal system, courts are often called upon to apply laws of ancient origin to modern circumstances. *See Kaiser Steel Corp. v. Jacobs (In re Kaiser Steel Corp.)*, 87 B.R. 154, 160–61 (Bankr.D.Colo.1988). Care must be exercised in doing so, as when applying specific elements of fraudulent conveyance law to leveraged buyouts. However, fraudulent conveyance statutes remain as fully applicable to LBOs as they do to other asset transfers.

The more subtle issue is not whether, but how, fraudulent conveyance law is applied to the complex series of transactions that make up a leveraged buyout. If each transfer of assets that takes place is viewed in isolation, the result may well be different than if the transaction is treated as an integrated whole.

■ In general, courts will look past the form of a transaction to its substance. "Thus, an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir.1993) (internal quotations and citations omitted). "It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the [fraudulent conveyance statutes]." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir.1995)

(citation omitted); *see also Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 212 (3d Cir.1990).

■ This principle applies with full force to LBOs. No single transfer would take place without the expectation that the entire transaction will be consummated. *See United States v. Tabor Realty Corp.*, 803 F.2d 1288, 1302–03 (3d Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). Accordingly, LBOs are routinely treated as unitary transactions for purposes of fraudulent conveyance laws. *See HBE Leasing*, 48 F.3d at 635; *Kupetz*, 845 F.2d at 846 n. 6; *Murphy v. Meritor Savings Bank (In re O'Day Corp.)*, 126 B.R. 370, 394 (Bankr.D.Mass.1991); *Wieboldt Stores*, 94 B.R. at 502. That approach is appropriate here, where all parties to each subsidiary transfer were aware of the overall leveraged buyout. *See HBE Leasing*, 48 F.3d at 635–36.

### C. Actual Fraud

■ Pursuant to section 276 of the New York Debtor and Creditor Law, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y.Debt. & Cred.Law § 276. The laws of Minnesota and Delaware are similar. Minn.Stat. § 513.44(a)(1); Del. Code Ann. tit. 6, § 1307. A transfer made with actual intent to defraud is fraudulent regardless of whether the debtor receives fair consideration. *HBE Leasing*, 48 F.3d at 639.

■ The burden of proving actual intent is on the party seeking to set aside the conveyance. *See United States v. McCombs*, 30 F.3d 310, 328 (2d Cir.1994); *ACLI Government Securities, Inc. v. Rhoades*, 653 F.Supp. 1388, 1394 (S.D.N.Y.1987), *aff'd*, 842 F.2d 1287 (2d Cir.1988); *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 126, 508 N.Y.S.2d 17, 20 (2d Dep't 1986). Such intent must be demonstrated by clear and convincing evidence. *See HBE Leasing*, 48 F.3d at 639; *McCombs*, 30 F.3d at 328; *ACLI*, 653

F.Supp. at 1394; *Marine Midland,* 120 A.D.2d at 126, 508 N.Y.S.2d at 20.

■ Direct evidence of fraudulent intent is rare. Therefore, courts will consider "badges of fraud" which are circumstances that accompany fraudulent transfers so commonly that their presence gives rise to an inference of intent. *See Marine Midland,* 120 A.D.2d at 128, 508 N.Y.S.2d at 21–22; *Gafco, Inc. v. H.D.S. Mercantile Corp.,* 47 Misc.2d 661, 664, 263 N.Y.S.2d 109, 114 (Sup. Ct.N.Y.Co.1965). Such factors include (1) a close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (5) the use of dummies or fictitious parties; and (6) retention of control of property by the transferor after the conveyance. *See HBE Leasing,* 48 F.3d at 639; *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1041 (2d Cir.1984); *ACLI,* 653 F.Supp. at 1394; *Marine Midland,* 120 A.D.2d at 129, 508 N.Y.S.2d at 22; *Gafco,* 47 Misc.2d at 664, 263 N.Y.S.2d at 114. Depending on the context, badges of fraud will vary in significance, though the presence of multiple indicia will increase the strength of the inference. *See Gross v. Russo (In re Russo),* 1 B.R. 369, 382 (Bankr.E.D.N.Y.1979); *Gafco,* 47 Misc.2d at 664–65, 263 N.Y.S.2d at 114.

In the instant case, the plaintiffs have presented no direct evidence at all of fraudulent intent. There is no document or testimony to the effect that the defendants expected to reap the profits of the LBO and leave behind a shell company unable to pay its debts. To the contrary, the defendants sold a business that appeared at the time to be thriving. Their optimism was shared by multiple independent entities including MAST, the buyer of the company; Security Pacific, the financing bank; and even competitors who foresaw substantial growth for VDAS. Moreover, any suggestion of fraudulent intent is belied by the continued investment in the company by Mr. Hirsch, Mr. DePalma, and Mr. Meli. It is true that these individuals profited substantially from the LBO, but it is unlikely that they would retain a financial stake in the

business if they believed that it would fail. This is particularly true of Mr. DePalma and Mr. Meli, who risked not only their funds but also their reputations by continuing to serve as executives of VDAS after the LBO.

Nor do the badges of fraud aid the plaintiffs in demonstrating actual intent. There was no close relationship among the parties to the LBO; rather, it was an arm's-length transaction by sophisticated businesspeople. *Cf. McCombs,* 30 F.3d at 328 (transfer to daughters); *ACLI,* 653 F.Supp. at 1395 (transfer to sister and law partner); *Marine Midland,* 120 A.D.2d at 128, 508 N.Y.S.2d at 22 (transfer to wife and bookkeeper). Of course, there was a relationship between VDAS as transferor and its former owners who were transferees by virtue of receiving the profits from the sale of their interest. However, the sale of one's ownership of a business does not raise an inference of fraud.

The transaction was not secretive, nor was it structured in a manner unusual for an LBO. It was accomplished with some dispatch, but that is characteristic of LBOs and relates simply to the need to consummate the deal while all parties are on board.

As will be discussed below in connection with constructive fraud, VDAS did not receive consideration commensurate with the debt it incurred in connection with the LBO. Thus, at least one "badge of fraud"—inadequate consideration—was present here.

So, too, the defendants were aware of the claims of the twelve percent noteholders. However, as will be addressed further below, they had a reasonable belief that these debts would be paid off over time after the LBO was completed.

The defendants did create shell companies in connection with the LBO. However, there has been no showing that this was in any respect fraudulent, since assets were never secreted in these entities. Rather, they served simply as a convenience for effectuating the transaction.

Finally, certain defendants did retain some control over VDAS after the LBO: Mr. Hirsch as an investor and Mr. DePalma and Mr. Meli as both investors and managers. But the critical question for purposes of in-

ferring fraudulent intent is whether the *transferor* retained control over the assets that creditors seek to recover. Here VDAS certainly had no residual control over the money that flowed to the sellers.

Notwithstanding the lack of evidence of actual intent, the plaintiffs argue that where a transferor could have foreseen the harmful effect of the conveyance on creditors, intent to defraud should be inferred. They contend that the defendants here should have anticipated that their projections were overly optimistic and could not be achieved. Therefore, the plaintiffs reason, the LBO predicated on those projections was fraudulent.

The caselaw on which the plaintiffs ground their argument is too thin to support it. It is true that in *United States v. Gleneagles Investment Co.*, 565 F.Supp. 556 (M.D.Pa.1983), *aff'd in relevant part sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), the district court suggested that foreseeability could lead to an inference of intent. *Id.* at 581. On appeal, however, the Third Circuit affirmed the lower court's conclusion not on the basis of foreseeability, but on the principle that a party is deemed to have intended the natural consequences of his acts. *Tabor Court Realty*, 803 F.2d at 1305. Then, in *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir.1992), the same Court of Appeals further distanced itself from the foreseeability argument, noting that the *Gleneagles* case presented a particularly egregious set of facts and that the LBO in that case was in any event voidable under principles of constructive fraud. *Id.* at 1075.

There is no indication that the courts of New York or the other relevant jurisdictions have imported the concept of foreseeability into an analysis of actual intent to defraud. Such a standard, though appropriate where culpability is based on negligent conduct, is incompatible with the concept of actual fraud.

The plaintiffs, then, have failed to meet their burden of showing actual fraud, and the analysis can now shift to claims of constructive fraud.

### D. *Constructive Fraud*

██ A transfer is a constructive fraudulent conveyance if it is made without fair consideration, N.Y.Debt. & Cred.Law § 272, and (1) the transferor will be rendered insolvent, N.Y.Debt. & Cred.Law § 273, or (2) the transferor will be left with unreasonably small capital, N.Y.Debt. & Cred.Law § 274, or (3) the transferor intends or believes that it will incur debts beyond its ability to pay as they mature, N.Y.Debt. & Cred.Law § 275. *See Crowthers McCall*, 129 B.R. at 997; *Julien J. Studley, Inc. v. Lefrak*, 66 A.D.2d 208, 212, 412 N.Y.S.2d 901, 905 (2d Dep't), *aff'd*, 48 N.Y.2d 954, 425 N.Y.S.2d 65, 401 N.E.2d 187 (1979); *see also* Minn.Stat. §§ 513.44(a)(2)(i) & (ii) & § 513.45(a).

The defendants contend that the plaintiffs must also prove at least some level of scienter in order to make out a claim of constructive fraud. They rely on cases where the courts have expressed unease about utilizing fraudulent conveyance laws to upset an LBO in the absence of some showing of bad faith. *See Kupetz*, 845 F.2d at 847; *Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.)*, 91 B.R. 430, 439 (Bankr.N.D.Ohio 1988); *Credit Managers Ass'n of Southern California v. Federal Co.*, 629 F.Supp. 175, 181 (C.D.Cal.1986).

But Courts interpreting the constructive fraud provisions of New York's Debtor and Creditor Law have repeatedly stated that the standards apply "without regard to the actual intent of the transferor or the transferee." *Crowthers McCall*, 129 B.R. at 997; *see also Gelbard v. Esses*, 96 A.D.2d 573, 575–76, 465 N.Y.S.2d 264, 267–68 (2d Dep't 1983); *Julien J. Studley*, 66 A.D.2d at 213, 412 N.Y.S.2d at 905. The objective test established by the legislature for determining constructive fraud would thus be unjustifiably altered if the Court were to impose an additional scienter requirement. The distinctive features of an LBO as compared to other transactions provide no basis for deviating from the existing standard.

#### 1. *Fair Consideration*

██ The threshold question, then, for each mode of analysis of constructive fraud is whether the transfer was made for fair consideration. The burden of proof on this issue

is generally on the creditor seeking to set aside the conveyance as fraudulent. *See McCombs,* 30 F.3d at 323; *Gelbard,* 96 A.D.2d at 576, 465 N.Y.S.2d at 268.

It is the debtor who must have received value as the result of the transfer. In the context of an LBO, this issue is determined after "collapsing" the transaction and ascertaining what the target, rather than any third party, received. *See Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d at 646; *Murphy,* 126 B.R. at 394; *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.),* 124 B.R. 984, 997 (Bankr.S.D.Ohio 1990). A quantitative analysis is required: nominal consideration will not suffice as fair consideration. *See Vadnais Lumber,* 100 B.R. at 136 ("unlike the doctrine of consideration in contract law, [the value received by the debtor] must pass a measurement test"). By the same token, "[f]air equivalence only requires that the value of the consideration be reasonably equivalent rather than exactly equivalent in value to the property transferred or obligation assumed." *Murphy,* 126 B.R. at 393.

Because the assets of the target are pledged as security for a loan that benefits the target's former owners rather than the target itself, it is unlikely that any LBO can satisfy fair consideration requirements. *See Credit Managers,* 629 F.Supp. at 182; Richard M. Cieri, et al., *An Introduction to Legal and Practical Considerations in the Restructuring of Troubled Leveraged Buyouts,* 45 Bus.Law. 333, 354 (1989). This case is no exception.

As a consequence of the LBO, VDAS incurred the obligation to repay $55 million in debt to Security Pacific. In return, VDAS was able to retire approximately $27 million in preexisting debt and it retained about $1.2 million from the loan. Thus, the direct consideration received by VDAS in the LBO was some $26.8 million short of being equivalent to the obligations it incurred.

That, however, does not end the inquiry. An LBO or other complex corporate transaction may give rise to indirect benefits to the debtor that must also be included in the calculation. *See Mellon Bank,* 945 F.2d at 646; *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 993 (2d Cir.1981); *Yoder,* 124 B.R. at 997; *Vadnais Lumber,* 100 B.R. at 136. Such indirect benefits may include the synergistic effects of new corporate relationships, *see Mellon Bank,* 945 F.2d at 647, including the benefits that may accrue from arrival of a new management team. *But see Moody,* 127 B.R. at 993 (new management does not fall within definition of fair consideration); *Credit Managers,* 629 F.Supp. at 182 (management's services not fair consideration when no identifiable monetary value). The tax benefits that a target receives as a consequence of an LBO also constitute an indirect benefit. Finally, the availability of additional credit to the company after the transaction may be consideration, at least if it is demonstrated that it facilitates additional business opportunities for the target. *Compare Mellon Bank,* 945 F.2d at 647 ("[t]he ability to borrow money has considerable value in the commercial world") *with Murphy,* 126 B.R. at 394–95 (no value in obtaining loan, since borrower incurs repayment obligation along with proceeds).

In this case, the defendants argue that VDAS reaped two forms of indirect benefits from the LBO: (1) favorable tax treatment due to the write-down of assets made possible by the transaction, and (2) the availability of the $10 million revolving credit line from Security Pacific. However, without proof of the value of such benefits, it cannot be said that they qualify as fair consideration.

> [W]here the creditor asserts that the transferees paid insufficient consideration and the evidentiary facts as to the nature and value of the consideration are within the transferees' control, the burden of coming forward with evidence disclosing the nature and value of the [consideration] ... should be cast upon the transferees.

*Gelbard,* 96 A.D.2d at 576, 465 N.Y.S.2d at 268 (citation omitted). Here, any information concerning the value of indirect benefits received by VDAS is within the control of the defendants, and so it is appropriate to shift to them the burden of coming forward with supporting evidence. *See McCombs,* 30 F.3d at 324 (burden of production, but not burden of persuasion, can shift where nature and

value of consideration is within defendant's control); *ACLI*, 653 F.Supp. at 1391. They have produced no such proof. It would be sheer speculation to assume that the tax benefits and economic value of the loan could be reasonably equivalent to the $26.8 million shortfall in consideration. Indeed, even if the $10 million provided by Security Pacific had been a gift rather than a credit line, the consideration received by VDAS would still be far from fair. The plaintiffs, then, have established the first element of constructive fraud: the absence of fair consideration.

## 2. *Insolvency*

### (a) *Burden of Proof*

Where, as here, the absence of fair consideration has been demonstrated, the burden of coming forward with proof that the debtor nonetheless remained solvent shifts to the defendants. *See ACLI*, 653 F.Supp. at 1393 ("When a transfer is made without consideration, the burden of going forward with proof of solvency is on the defendants."); *Hassett v. Far West Federal Savings & Loan Ass'n (In re O.P.M. Leasing Services, Inc.)*, 40 B.R. 380, 393 (Bankr. S.D.N.Y.) ("[T]he New York Debtor and Creditor law evinces a policy protective of creditors in placing the burden of going forward with proof of the debtor's solvency on the transferee."), *aff'd*, 44 B.R. 1023 (S.D.N.Y.1984), *aff'd*, 769 F.2d 911 (1985). Here, the defendants have presented some proof of VDAS' solvency through, among other things, the Houlihan Lokey letter and the reports of their expert witnesses and have thus satisfied their burden of production. The burden of persuasion remains with the plaintiffs. *See Ohio Corrugating*, 91 B.R. at 435–36 (burden under Federal Bankruptcy Code, 11 U.S.C. § 548(a)(2)); *Kupetz v. Continental Illinois National Bank and Trust Co.*, 77 B.R. 754, 762 (1987) (burden under California fraudulent conveyance law).

### (b) *Liabilities*

Determination of solvency requires a comparison of VDAS' assets to its liabilities im-mediately after the LBO. While not entirely free from controversy, the valuation of VDAS' liabilities is the more straightforward issue, and I will address it first. For purposes of its solvency letter, Houlihan Lokey valued VDAS' liabilities at $105.4 million. (DX 170 at 1). The consolidated balance sheet submitted by Arthur Young on October 28, 1988 showed liabilities as of August 1 of $115,097,000. (DX 171 MV026168). An expert witness for the defendants, Mr. DiNapoli, calculated the liabilities as of that date to be $122,597,000, while Mr. Smith, the plaintiffs' expert, figured them at $125,348,000. (DX 533, Exh. 6; PX 49–A at 1–2).

The differences among these valuations are attributable to three sources. First, in contrast to any of the other calculations, those performed by Houlihan Lokey did not include current liabilities. Its valuation of liabilities therefore cannot be compared directly to those of the other analysts. Moreover, in each method that Houlihan Lokey utilized, it determined the entire value of the company and therefore, implicitly included current assets.[7] It would thus seem that current liabilities should have been considered as well.

Second, Arthur Young's analysis differs from both Mr. Smith's and Mr. DiNapoli's because the accounting firm calculated VDAS' long term debt at its fair value rather than face value. (DX 171 at MV026168; PX 49A at 1–2; DX 533 at Exh. 6). Unfortunately, there is little evidence in the record justifying one approach or the other. However, as will be seen, the determination of solvency does not turn on resolution of this issue.

Third, Mr. Smith's estimate is $2,751,000 higher than Mr. DiNapoli's because Mr. Smith included unrecorded transaction costs in that amount. (PX 49A at 1–2). Certainly, if such costs were incurred, they are properly considered as liabilities. But Mr. Smith did not identify these costs with any specificity, and they are best treated as an uncertain variable. As a result, VDAS' liabilities im-

---

**7.** Mr. DiNapoli and Mr. Smith did this explicitly. They estimated the total value of VDAS, ascribed part of it to identified current assets, and allocat-ed the balance to intangible assets. (DX 533 at Exh. 6 n. 6; PX 49A at 1–2).

mediately after the LBO were most likely in a range between approximately $115 million (calculating long term debt at fair value and excluding unbooked costs) and $125 million (using the face value of debt and including unrecorded costs).

#### (c) Assets

#### (1) Purchase Price as Valuation

 The value of VDAS' assets must be measured against these liabilities. Although not determinative, "purchase price may be highly probative of a company's value immediately after a leveraged buyout...." *Moody*, 971 F.2d at 1067. Where a transaction is consummated after arms-length negotiations, and particularly where other potential purchasers expressed interest in buying the company on similar terms, the sale price is a good indicator of the value of the target's assets. *See Credit Managers*, 629 F.Supp. at 188. That is the case here. MAST proceeded with the LBO with full information and without coercion. Furthermore, other bidders expressed interest in purchasing VDAS at prices similar to that ultimately paid.[8]

Nevertheless, the plaintiffs argue that in valuing VDAS the purchase price should be discounted by any transfers that were made without consideration. In support of this contention, they rely on *Vadnais Lumber*, 100 B.R. at 130–31. Even if it were appropriate to treat an LBO piecemeal rather than as an integrated transaction, this argument is flawed in two respects. First, the principle espoused in *Vadnais Lumber* of ignoring certain transfers in a solvency analysis has apparently never been endorsed by any other court. Second, to the extent that the purchaser in an LBO knows of any transfer that will drain assets from the target, he has necessarily considered that transfer in establishing the price he is willing to pay. In other words, the market has already taken such transfers into account. In this case MAST was fully aware of all aspects of the LBO. Thus, there is no basis for artificially modifying the purchase price.

Even the purchase price is not easily ascertained in a complex LBO. The MAST

financing memorandum identified the price as $122 million, and the Houlihan Lokey analysis estimated it as $124 million. Mr. Bergschneider testified that the price was between $110 and $120 million, but his low-end estimate was based in part on an arbitrarily low valuation of the preferred stock that the seller received as part of the deal. Therefore, the most reliable evidence indicates that the assets of VDAS were transferred for between $120 and $124 million.

#### (2) Discounted Cash Flow

 Both the plaintiffs and the defendants presented evidence of the value of VDAS based on discounted cash flow. This is an appropriate method of determining the going concern value of a company that is not in imminent danger of collapse. *See Moody*, 971 F.2d at 1067; *Vadnais Lumber*, 100 B.R. at 131–32 ("The proper standard of valuation to be applied in determination of solvency in a bankruptcy preceding is the value of the business as a going concern, not the liquidation value of its assets less its liabilities."). The wide variance in valuations is attributable to differences in initial earnings figures, in the growth rate applied to those figures, and in the discount rate selected.

The evidence proffered by the defendants relies largely upon the projections made by VDAS, and so its accuracy depends upon the reliability of those projections. With the acuity that comes from hindsight, we know that the forecasts were inaccurate: VDAS failed to meet management's expectations. However, given the information that was available to VDAS at the time the Final LBO Projections were made, I find them to have been reasonable.

First, VDAS engaged in an appropriate methodology for developing its forecasts. By conducting a base-by-base review to draft a budget from the bottom up, VDAS properly relied on the expertise of its operating personnel. (Tr. 1397–98). Although the financial records at some of the newly acquired bases were less than complete, VDAS made reasonable efforts to compensate for the lack of reliable data. (Tr. 775, 807–08, 1120–21;

---

**8.** Bessemer and Mr. Rosenthal discussed a possible purchase in the range of $100–$110 million, but that was prior to the acquisition of Milwaukee Aero Services. (Tr. 951–52).

DX 21, 25, 44, 88). Further, Mr. Meli made explicit the assumptions on which the Final LBO Projections were based, and he tested the forecast against varying assumptions as reflected in his comparison of the MAST model with both a conservative scenario and a most likely outcome model.

The plaintiffs' suggestion that Mr. Meli deliberately inflated projections in order to "shop" VDAS is belied by the evidence. The Final LBO Projections were prepared after Security Pacific had agreed to finance the LBO based on its own more conservative forecasts, and so there was no incentive to overstate anticipated earnings. (Tr. 1477–78; DX 138, 143). Moreover, the upward revisions made by Mr. Meli between December 1987 and July 1988 reflected the acquisition of additional FBOs which were expected to experience dramatically increased cash flow. The fact that VDAS had already failed to meet previous projections did not automatically render the upward revisions unreasonable. VDAS management attributed the shortfall not to a chronic problem such as insufficient revenue but rather to one-time costs associated with the LBO and the acquisition of bases.

VDAS' treatment of specific uncertainties was also reasonable. For example, the decision not to incorporate in the forecast the impact of Sprite Flite at Lexington was based on the rational belief that it would not be economically feasible to operate two FBOs at that airport. Industry experts agreed with VDAS management that because of the volume of business at the airport and the inaccessibility of the Sprite Flite location to a fuel farm, its entry into the market seemed unlikely. Indeed, in retrospect we know that only one FBO has survived at Lexington. Management need not base its projections on an assumption that potential competitors will act against their economic self-interest. Therefore, it was appropriate to discount the possibility of Sprite Flite entering the market.

VDAS' projections for Nashville were also well-grounded. Prior to their acquisition by VDAS, the three Nashville FBOs had combined revenues of $16 million. (DX 61 at MV000032, MV000034, MV000036). Since VDAS had an earnings/revenues ratio of about 20%, it could expect earnings of approximately $3.2 million from Nashville prior to any growth attributable to capital improvements. (Tr. 1411–12; DX 404 at MV012615; DX 502 at 15). Therefore a projection of $3.9 million appeared achievable. Furthermore, Mr. Meli did not err by incorporating increased maintenance of Garrett engines in his forecasts. The additional "hot sections" performed as a result of the policy change by Garrett could be expected to continue on a permanent basis. (Tr. 1417–19). There is no basis for believing that corporate jet owners would take advantage of the policy once and then take their planes out of service because they lacked funds for a full overhaul.

The specific assumptions that Mr. Meli made in reaching the figures used in the Final LBO Projections were also reasonable for the most part. In order to meet what was characterized as the "conservative" projection, VDAS was required to take steps well within its control such as raising fuel prices and reassigning hangar space. To attain the "most likely outcome," real growth would be needed, as, for example, from increasing the volume of fuel sold, providing new hangar space, or building rental parking. While a variety of circumstances beyond the control of VDAS could affect its ability to implement such strategies, they were not so speculative that they should have been ignored for purposes of forecasting. The only truly questionable contingency included in the projections was the prospect of winning two new customers for the Cleveland base, an event that Mr. Meli felt was only an even bet to occur. On the other hand, Mr. Meli demonstrated restraint both in declining to project significant growth at Des Moines and in incorporating only a portion of the potential from an increase in commercial flights to Milwaukee. Thus, the Final LBO Projections, though not verified by subsequent events, were reasonable at the time.

These projections were, in turn, the starting point for Arthur Young's discounted cash flow analysis. Arthur Young then applied a growth rate of 8.5% to the initial year's projected earnings and calculated cash flow over

seven years. This growth rate, which is consistent with that used by Mr. Meli, properly took into account VDAS' historical growth rate as well as forecasted expansion for relevant sectors of the aviation industry. Moreover, experts in the FBO market agreed that this was an appropriate growth rate. While steady growth at this rate over seven years is an optimistic assumption, Arthur Young dampened the inflationary effect by assigning a growth rate of zero to the terminal value. It then used an accepted method for calculating a discount rate of 11.5%. The resulting valuation of $124–$144 million was credible, at least at the low to middle portion of the range.

Houlihan Lokey's discounted cash flow analysis reached a similar result. It, too, began with the Final LBO Projections and increased earnings at a rate of about 8% over five years. It then applied alternative growth rates between 3% and 7% to the terminal value. Finally, Houlihan Lokey used very conservative discount rates ranging from 13% to 15%. The resulting range of valuations from $119 to $131.2 million was well supported, with the most accurate estimate probably being toward the middle to upper end of the range because of the generally high discount rates used.

Dominic DiNapoli, one of the defendants' experts, also utilized VDAS' projections for his discounted cash flow analysis. He simply adopted those forecasts for the period through 1993 and then applied the inflation rate of 4.4% to the terminal value in perpetuity. Using the weighted average cost of capital method, he selected a discount rate of 11.5%. Although this method is open to question because it requires the identification of a "comparable" public company, in this case it resulted in a discount rate similar to that arrived at by Arthur Young using a different method. This correlation lends credence to both analyses. Mr. DiNapoli arrived at a valuation of almost $165 million. This figure is well above both the Arthur Young and Houlihan Lokey estimates, apparently because the perpetual growth of the terminal value had a significant impact on the calculations. This analysis substantially overstates the post-LBO value of VDAS.

While Mr. DiNapoli's analysis was flawed, the opinions rendered by the plaintiffs' experts also suffered from serious defects. Wilbur Ross purportedly began with the Final LBO Projections, though he chose to use 1988 rather than 1989 as the base year. He then arbitrarily averaged that number with an annualized figure that was based in part on VDAS' earnings for the first seven months of 1988. Those actual results were nonrepresentative, however, both because VDAS incurred unusual nonrecurring expenses during that period and because the potential earnings of three FBOs acquired during that time were not fully reflected. (Tr. 229–31, 260–62; DX 508). Indeed, even the plaintiffs' other expert, Mr. Smith, did not consider this annualized period representative. (Tr. 518–19).

Mr. Ross' analysis was further undermined by his use of unrealistically low growth rates of 3% to 6%. At the lower end of the range, the growth rate did not even match the inflation rate in 1988. (Tr. 235). At the high end, Mr. Ross diluted the projection by assuming zero growth for one year. (Tr. 195–97). In contrast to witnesses who endorsed a growth rate of at least 8%, Mr. Ross had no experience in the industry. Moreover, his view of the FBO industry as stagnant was based on a review of general aviation forecasts, which are less relevant to the FBO business than those projections for the turbojet and turboprop segments which indicated continued growth. (Tr. 269–70, 816, 869–70, 938; DX 507, 513).

Finally, Mr. Ross chose excessively high discount rates ranging from 14% to 17%. He used no valuation technique, but relied simply on his experience to select "the kind of rate of return that a buyer would expect to achieve from the acquisition of a pedestrian-type business." (Tr. 187). With no information about the comparable businesses that Mr. Ross had in mind, this aspect of the analysis has no foundation.

Since Mr. Ross did not adequately support the initial earnings figures he relied on, the growth rate he chose, or the discount rate used, the results of his discounted cash flow analysis are discredited.

The valuation performed by Richard Smith, the plaintiffs' other expert, was likewise faulty. It began with a projected earnings figure of about $11 million, far lower than that used by any other analyst. Mr. Smith reached this number using the operating results of newly acquired FBOs before they had become part of the VDAS chain. The pre-VDAS earnings, however, failed to reflect the profitability of these FBOs within the VDAS system. Recognizing this, Mr. Smith increased those figures by 25%. That enhancement, however, was arbitrary in two respects. First, it was not in line with the doubling of earnings that VDAS had achieved with prior acquisitions. Second, it did not take into account potential cost savings and profit enhancements at specific bases.

Moreover, Mr. Smith made errors in identifying the appropriate historical results to use for individual bases. For example, he used figures for less than a full year for Cleveland and for Nashville Aviation Services. (Tr. 448–50; DX 61). He also failed to adjust the figures for Des Moines and for Nashville Jet Corporation to conform to VDAS' accounting format. (Tr. 459–62). Had he corrected these two sets of errors, Mr. Smith would have started with a base projection of $13 million. And, if he had also assumed a doubling of earnings by the newly-acquired FBOs, he would have projected earnings of more that $16 million. (Tr. 499–501). These adjustments to the base projection would by themselves have resulted in a valuation of $123,821,000. (Tr. 556–58).

Mr. Smith also used an inappropriately low growth rate of 6%. Like Mr. Ross, he chose this figure based on his review of the general aviation industry, which was not an appropriate benchmark.

Mr. Smith further deflated his projections by reducing earnings for the first year by $2.5 million to account for capital improvements while at the same time failing to incorporate the greater profits that would presumably be generated by the improved facilities. (Tr. 558–60).

Finally, Mr. Smith used an inordinately high pre-tax discount rate of 20%. It was inappropriate to ignore the effect that potential tax benefits would have on the value of VDAS. (Tr. 184–85, 585, 1022–23, 1616–17). Had he adjusted the discount rate for taxes, Mr. Smith would have used a rate of about 12%, similar to that adopted by the defendants' witnesses. (Tr. 585). Mr. Smith's discounted cash flow analysis, then, lacks an adequate foundation.

Based on the credible discounted cash flow analyses, VDAS appears to have had a minimum value of $125 million to $135 million immediately after the LBO.[9]

### (3) Comparables

A number of the witnesses also performed valuations using comparable companies or comparable transactions. Because there is legitimate disagreement over how "comparable" one business is to another, these analyses incorporate additional variables. Accordingly, they are best utilized to corroborate valuations obtained by other methods.

The most reliable comparability analysis in this case was performed by W. Stephen Dennis. Mr. Dennis had the most experience in examining the FBO business and so was best qualified to identify comparables. Furthermore, Mr. Dennis recognized the unique characteristics of individual FBOs within VDAS and adjusted his analysis by enhancing or deflating the transaction multiple for each base. The valuation at the low end of his range—$132 million—is consistent with the more credible discounted cash flow analyses.

Richard Smith, one of the plaintiffs' experts, performed two analyses that relied upon comparisons with other transactions. In the first he derived a market multiple of 7.5, which represented the relation between a base earnings figure and the sale price of companies in the FBO industry. He then multiplied this number by his base projection of $11 million. Because that base projection was faulty, the resulting valuation is not trustworthy.

---

9. That this value slightly exceeds the purchase price is not anomalous. In such cases, the buyer has received something of a bargain. By the same token, the purchase price could have been greater than the value of the business, in which case the buyer would have overpaid.

In the second method, Mr. Smith again applied the 7.5 multiple, but only to the earnings of FBOs that VDAS had owned prior to 1987. With respect to the newly acquired FBOs, he simply took their purchase price and increased it by 25%. As discussed above, the 25% enhancement was arbitrary and did not reflect actual growth by FBOs that VDAS had acquired. The earnings figure for pre–1987 FBOs was deflated as well, because Mr. Smith failed to adjust 1987 operating figures for growth in 1988, which was his base year. (Tr. 504). Accordingly, this analysis, too, is unpersuasive.

In sum, the most convincing evidence points to a conservative valuation of VDAS after the LBO in a range of $125–$135 million. Even if it were assumed that the plaintiffs had provided adequate evidence for each aspect of their calculation of VDAS' liabilities, those liabilities would not exceed $125 million. Therefore, the plaintiffs have failed to prove that the LBO rendered VDAS insolvent.

### 3. *Ability to Pay Debts*

A transfer may be set aside as fraudulent if the transferor, though its assets exceed its liabilities, is rendered unable to pay its debts as they come due. *See* N.Y.Debt. & Cred.Law § 275; *Crowthers McCall,* 129 B.R. at 997. This forward-looking standard is generally referred to as equitable insolvency. *See Moody,* 127 B.R. at 996. The defendants argue that in order to prevail, the plaintiffs must prove that the transferor subjectively intended to become incapable of paying its obligations. Notwithstanding the fact that equitable insolvency is a species of constructive rather than actual fraud, there is support for the defendants' position. By its terms, New York law deems a transfer fraudulent when "the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature." N.Y.Debt. & Cred.Law § 275; *see also Moody,* 127 B.R. at 991–92 (interpreting Pennsylvania statute); *Kupetz,* 77 B.R. at 763–64 (interpreting Uniform Fraudulent Conveyance Act).

Certainly, the plaintiffs have adduced no evidence of an actual belief by the defendants that VDAS would be unable to pay its debts. Mr. Bergschneider and MAST purchased VDAS with the intent that it would prosper. Mr. Hirsch, Mr. DePalma, and Mr. Meli all retained interests in the company that were dependant upon its continued success.

Nor do the plaintiffs prevail even if the proper standard is whether the defendants should have foreseen that VDAS would ultimately be unable to meet its obligations. The foreseeability of VDAS' downfall depends on the reasonableness of the projections that had been prepared. We know, with hindsight, that the forecasts were not realized. But "[t]he question the court must decide is *not* whether [the] projection was correct, for it clearly was not, but whether it was reasonable and prudent when made." *Credit Managers,* 629 F.Supp. at 184. "Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance." *Moody,* 971 F.2d at 1073. As discussed above, there was adequate support for the Final LBO Projections.

Nevertheless, "reliance on historical data alone is not enough. To a degree, parties must also account for difficulties that are likely to arise ... and ... incorporate some margin for error." *Id.* Here, VDAS built into its forecast some cushion. It did not, for example, simply adopt the aggressive MAST Model, but instead chose a more likely outcome built on identified assumptions. Moreover, independent analyses that utilized still more conservative assumptions found that VDAS would be able to meet its obligations. For instance, Security Pacific financed the LBO based on projections of $15.7 million rather than the $17 million in the Final LBO Projections. (DX 137 at S102984). Similarly, Arthur Young determined that VDAS could meet its debt obligation with a base budget of $15.2 million. (Tr. 1075–77; DX 243).

The plaintiffs make much of the fact that in 1994 VDAS would be required to make a balloon payment on the principal owed to Security Pacific. But this fails to demonstrate VDAS' inability to meet its debts for

several reasons. First, according to the VDAS budget, much of Security Pacific's senior debt would have been paid off by 1994. (DX 170 at 6). Second, the plaintiffs presented no credible evidence that VDAS would be unable to refinance its debt in 1994. To the contrary, Mr. Howard of Houlihan Lokey testified that refinancing was common in such LBOs and was reasonably anticipated in this case in light of the cash flows that were projected. (Tr. 1197–1200). Finally, VDAS' inability to pay the twelve percent noteholders occurred well before the balloon payment and VDAS's actual inability to meet its obligations. *See Moody*, 971 F.2d at 1064 (constructive fraud requires causal link between conveyance and debtor's bankruptcy).

### 4. *Working Capital*

The final test for a fraudulent conveyance is whether the transferor has been left with insufficient working capital. Although a few courts have equated this with equitable insolvency, "the better view is that unreasonably small capital denotes a financial condition short of equitable insolvency." *Moody*, 971 F.2d at 1070; *see also Murphy*, 126 B.R. at 407; *Vadnais*, 100 B.R. at 137. The test is aimed at transferees that leave the transferor technically solvent but doomed to fail. *Moody*, 971 at 1070 & n. 22.

In order to determine the adequacy of capital, a court will look to such factors as the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue. *See Moody*, 127 B.R. at 998; *Murphy*, 126 B.R. at 407–08; *Yoder*, 124 B.R. at 999; *Credit Managers*, 629 F.Supp. at 183–88. Again a court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made. *See Murphy*, 126 B.R. at 404. And, the adequacy of capital need only be tested within a reasonable period of the transfer at issue. *See Barrett v. Continental Illinois National Bank & Trust Co.*, 882 F.2d 1, 4 (1st Cir.1989), *cert. denied*, 494 U.S. 1028, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990); *Moody*, 127 B.R. at 996. While a company must be adequately capitalized, it does not need resources sufficient "to withstand any and all setbacks." *Credit Managers*, 629 F.Supp. at 187.

The only evidence presented by the plaintiffs on this issue is testimony by Mr. Smith that VDAS was left with small working capital by the LBO. (Tr. 306). However, Mr. Smith had little experience with the FBO industry and admitted that companies with rapid inventory turnover can operate with small working capital. (Tr. 657).

By contrast, Mr. Hirsch and Mr. Dennis testified that FBOs use minimal working capital, in part because their fuel stocks are constantly turning over. (Tr. 939–41; 1295). Furthermore, the debt to equity ratio for VDAS was similar to that of other FBOs. (Tr. 1571–73). Lastly, the adequacy of VDAS' working capital was demonstrated by events following the LBO: VDAS continued to meet its debt obligations through 1989, and Arthur Young determined in April of that year that VDAS was still a going concern. (DX 243). That the company remained viable so long after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout. *See Moody*, 127 B.R. at 985 (creditors paid for twelve months); *Ohio Corrugating*, 91 B.R. at 440 (creditors paid for ten months); *Credit Managers*, 629 F.Supp. at 184 (projections for twelve months reviewed).

The more persuasive view is that VDAS failed because of a concurrence of factors not related to the financial structuring of the LBO. The rapid emergence of competition at Lexington, the insensitive manner in which a ramp fee was imposed, the loss of business because of the termination of a key maintenance supervisor, and the failure to implement planned growth and cost-saving strategies all contributed to VDAS' ultimate demise. No doubt, VDAS could have weathered even these setbacks if it had unlimited working capital, but that is not the proper legal standard. VDAS did retain sufficient capital to sustain its operation for a substantial period after the LBO. *See Kupetz*, 845 F.2d at 850 (management errors after LBO no basis for fraudulent conveyance claim); *Moody*, 127 B.R. at 989, 1000 (fraudulent conveyance law not insurance against compa-

ny problems after LBO); *Credit Managers,* 629 F.Supp. at 185.

*Conclusion*

Although fraudulent conveyance laws are fully applicable to leveraged buyouts, they do not constitute insurance against the ultimate failure of the company. In this case, the plaintiffs have failed to prove that the buyout of VDAS was either an actual or constructive fraudulent conveyance. Accordingly, the Clerk of Court shall enter judgment dismissing the complaint.

SO ORDERED.