UNITED STATES FIDELITY AND GUARANTY COMPANY, Fidelity and Guaranty Insurance Company, Plaintiffs,

v.

J. UNITED ELECTRICAL CONTRACTING CORP., Jerry G. Sarabella, Natalie Sarabella, Defendants.

No. 99 CV 551(NG).

United States District Court, E.D. New York.

Aug. 9, 1999.

ilyn Dolan Go, who has filed a thorough and cogent report recommending that, in certain respects, as to defendant Jerry Sarabella, both applications be granted. Sarabella objects to certain factual findings made, and conclusions reached, by Judge Go.

■ Judge Go's report and recommendation is soundly based upon the evidentiary record before her and there is no objection by defendant to any of her legal conclusions. Instead, defendant Jerry Sarabella objects to certain of her factual findings on the basis of a newly submitted affidavit and purported copies of documents. However, Sarabella admittedly submitted no papers and made no appearance at the preliminary injunction hearing. He now states this is because he "was overwhelmed by a number of legal proceedings." This is not an excuse. Nor is it a justification for either a remand to Judge Go to revisit her factual findings or for this court to overturn those findings. This court's review of a magistrate judge's report and recommendation is *de novo* and the court is permitted, in its discretion, to accept supplemental evidence. *See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b); *Hynes v. Squillace*, 143 F.3d 653, 656 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998). But it is well established that the court may also decline to exercise its discretion to allow such supplementation. Thus, the Second Circuit in *Hynes* noted that:

[W]e have upheld the exercise of the district court's discretion in refusing to allow supplementation of the record upon the district court's de novo review. *See, e.g., Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137–38 (2d Cir. 1994) (finding no abuse of discretion in district court's refusal to consider supplemental evidence); *Pan American World Airways, Inc. v. International Bhd. of Teamsters*, 894 F.2d 36, 40 n. 3 (2d Cir.1990) (holding that district court did not abuse its discretion in denying

Adam P. Friedman, Wolff & Samson, Roseland, NJ, for Plaintiff.

Hiram D. Gordon, Janvey, Gordon, Herlands, Randolph, Rosenberg & Cox, LLP, NY, for Defendant.

## ORDER

GERSHON, District Judge.

Plaintiffs' motion for a preliminary injunction and for a pre-judgment attachment were referred to the Honorable Mar-

plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *see also Wallace v. Tilley*, 41 F.3d 296, 302 (7th Cir.1994) ( "It is not in the interests of justice to allow a party to wait until the Report and Recommendation or Order has been issued and then submit evidence that the party had in its possession but chose not to submit. Doing so would allow parties to undertake trial runs of their motion, adding to the record in bits and pieces depending upon the rulings or recommendation they received") (internal quotation marks and citations omitted). 143 F.3d at 656. As similarly noted in *Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir.1988):

Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round. In addition, it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and—having received an unfavorable recommendation—shift gears before the district judge.

840 F.2d at 991. Here, the justification offered by defendant for seeking to reopen the record is plainly without merit.

The Report and Recommendation is adopted in its entirety. Plaintiffs are directed to settle a preliminary injunction order and order of attachment on two days' notice.

**SO ORDERED.**

*REPORT AND RECOMMENDATION*

GO, United States Magistrate Judge.

Plaintiffs United States Fidelity and Guaranty Company ("USF & G") and Fidelity and Guaranty Insurance Company ("FGIC") (collectively called "the Sureties") commenced this action on January 28, 1999 by order to show cause to attach certain of defendants' assets, to enjoin defendants from disposing of certain assets and to require posting of collateral in accordance with the terms of a "Master Surety Agreement" executed by the defendants. On January 28, 1999, the Honorable Nina Gershon granted plaintiffs' application for a temporary restraining order restraining defendants J. United Electrical Contracting Corp. ("J.United") and Jerry G. Sarabella from encumbering or disposing of assets and defendant Natalie Sarabella from encumbering property at 36 Jeffrey Place, Staten Island, N.Y. (the "Premises"). She also referred plaintiff's motions for preliminary injunctive relief and for pre-judgment attachment to me to conduct a hearing and to report and recommend.

For the following reasons, I respectfully recommend that plaintiffs' motions be granted, but only to the extent discussed below. As plaintiffs' counsel advised, defendant J. United filed a petition in bankruptcy on February 2, 1999. Since all proceedings in this Court against J. United are subject to the automatic stay in bankruptcy, *see* 11 U.S.C. § 362(a), this report and recommendation addresses only that portion of plaintiffs' motion seeking relief against the other two defendants, Jerry G. Sarabella and Natalie Sarabella.

**FINDINGS OF FACT**

The following findings of fact, which are based on submissions filed in support of their motions, are undisputed.[1]

At some time prior to August, 1992, J. United requested that USF & G consider issuing or procuring surety bonds on its behalf for construction projects. As a con-

---

1. No defendant appeared at the hearing held on February 4, 1999 nor did any file opposition papers. The Sureties rested on their written submissions, supplemented with a letter from Alan Friedman, plaintiffs' counsel, dated February 4, 1999 ("Friedman letter").

dition to the issuance or procurement of surety bonds, USF & G required that J. United, Jerry G. Sarabella, its president and principal, and Natalie Sarabella, Jerry Sarabella's wife, execute a standard "Master Surety Agreement." Paragraph II of the "Master Surety Agreement" required, *inter alia*, each signatory to indemnify the surety for any losses, costs and/or expenses which the surety may incur and to provide security to collateralize this obligation whenever the surety faces liability on bonds issued. Certification of Susan D. Weinstock dated January 22, 1999 ("Weinstock Cert."), ¶¶ 3–10; Certification of Denese Thompson dated January 19, 1999 ("Thompson Cert."), ¶¶ 2—6.

Jerry G. Sarabella attempted several times to return a Master Surety Agreement which only he had executed individually and on behalf of J. United, but which had not been executed by Natalie Sarabella. Thompson Cert., ¶ 8. In discussions with Denese Thompson, then underwriting manager for the J. United account, Jerry Sarabella initially explained that he was having marital difficulties, but later stated that his wife was fearful of losing their home at 36 Jeffrey Place, Staten Island, New York (the "Premises"). *Id.*, ¶¶ 9–10. The Premises was an asset listed on a financial statement submitted by Jerry Sarabella to induce to Sureties to extend their surety credit. Weinstock Cert., ¶ 48

and Exhibit "V." Ms. Thompson agreed that USF & G would issue a homestead exclusion rider exempting the Premises from the indemnification obligations imposed by the Master Surety Agreement in return for Natalie Sarabella's agreement to sign the Master Surety Agreement. Jerry G. Sarabella subsequently returned to USF & G a Master Surety Agreement purportedly executed on August 4, 1992 by Natalie Sarabella and Jerry G. Sarabella, individually and on behalf of J. United. Thompson Cert., ¶¶ 11—13. The executed Master Security Agreement included a rider which named FGIC also as a surety. The form agreement and rider are attached as Exhibit A to the Weinstock Cert., as supplemented by a complete copy of both pages of the agreement attached to the Friedman letter, and will be referred to as the Master Surety Agreement. Ms. Thompson then sent a rider with a homestead exclusion to Jerry G. Sarabella for execution, but USF & G never received this executed rider. Thompson Cert., ¶ 14; Weinstock Cert., ¶¶ 57–58.

In reliance upon the Master Surety Agreement purportedly executed by all the defendants, the Sureties, as co-sureties, issued and/or procured the issuance of the following performance and payment bonds in connection with three construction contracts:

1. Bond No.: 53–0120–11333–92–4
   Obligee: Marson Construction Corp.
   Project: Lenox Avenue Subway
   Penal Sum: $3,555,000.00
   Date Issued: January 24, 1995
   (copy annexed as Exhibit "B" to Weinstock Cert.)

2. Bond No.: 53–0120–26742–95–4
   Obligee: *Crow Construction Co.*
   Project: New York Congregational Home for the Elderly
   Penal Sum: $1,790,000.00
   Date Issued: October 2, 1995
   (copy annexed as Exhibit "C" to Weinstock Cert.)

3. Bond No.: 53–0120–05509–96–6
   Obligee: Insurance Company of North America
   Project: New York City Transit Authority Contract No. A–33715

Penal Sum:        $4,504,065.00
Date Issued:      January 12, 1996
(copy annexed as Exhibit "D")

---

As discussed in greater detail in the Weinstock Certification, J. United defaulted in performance with respect to the contract for the Lenox Avenue Subway project secured by the first bond and Contract No. A–33715 of the New York City Transit Authority (the "NYCTA Contract") secured by the third bond. In January, 1997, USF & G received notice from Marson Construction Corp., the contractor on the Lenox Avenue subway project and obligee on the first bond, that Marson had declared J. United in default of the subcontract. The Sureties also learned that J. United had failed to pay its subcontractors, laborers and/or suppliers. Weinstock Cert. ¶¶ 14–15. Marson ultimately terminated the subcontract in November, 1997 and demanded that the Sureties complete the project in accordance with the performance bond issued. *Id.,* ¶¶ 16, 17, 19.

The Sureties also received notice in July, 1997 that J. United was experiencing difficulties in paying its subcontractors, laborers and/or materialmen on the Congregational Home for the Elderly project covered by the second bond. *Id.,* ¶ 18.

On or about February 5, 1998, the NYCTA defaulted J. United on the NYCTA Contract, after apparently having been dissatisfied with efforts by J. United to comply with demands to improve performance. *Id.,* ¶ 20, 21 and Exhibits "I" and "J." The Insurance Company of North America, the obligee on the third bond, in turn, made demand upon the Sureties to complete this project pursuant to their performance bond. *Id.,* ¶ 23.

As a result of J. United's failure to pay subcontractors, laborers and/or suppliers for work performed or materials furnished in connection with all three of the bonded projects, the Sureties also have paid claims on the payment bonds. *Id.,* ¶¶ 25, 29.

Based on their examination of J. United's accounts, the Sureties determined that as of June 1, 1998, J. United owed approximately $674,000 to subcontractors and suppliers under the contracts bonded by the Sureties. *Id.,* ¶ 26.

The Sureties have investigated the claims against the Bonds and, in order to mitigate their damages, entered into agreements with the respective performance bond obligees to complete both the Lenox Avenue Subway project and the NYCTA Contract by employing new electrical contractors. *Id.,* ¶ 24 and Exhibits "L" and "M". The Sureties have paid losses, through December 31, 1998, of $1,302,-308.00 with respect to the payment and performance bonds, and costs and expenses of $73,323.00. *Id.,* ¶ 29 and Exhibit "O". As the Sureties continue to investigate claims and complete the projects, and as additional claims are received, the Sureties' losses, costs and expenses will increase. *Id.,* ¶ 30. The Sureties have projected the sum of the outstanding bonded payables and the cost to finish the Lenox Avenue Subway project and the NYCTA Contract pursuant to the completion agreements into which the Sureties entered, less the remaining contract balance expected to be recovered thereunder, to be $1,463,419.00.

In a letter dated March 26, 1998, the Sureties demanded that all the defendants deposit with the Sureties the sum of $1,500,000.00 as required by paragraph III(B) the Master Surety Agreement in connection with the NYCTA Contract. *Id.,* ¶ 36. In subsequent letters dated August 5, 1998, September 1, 1998, and December 31, 1998, the Sureties demanded that defendants J. United and Jerry G. Sarabella reimburse the Sureties for sums expended and deposit collateral in connec-

tion with all the three bonded projects. Defendants have not complied with any of the demands. *Id.*, ¶¶ 36, 37, 41, 45.

On or about May 19, 1998, Natalie Sarabella informed USF & G that her signature on the Master Surety Agreement is a forgery and that this forgery was perpetrated by her husband, defendant Jerry G. Sarabella. *Id.*, ¶ 37 and Exhibit "Q." Natalie Sarabella's signature on the Surety Agreement appears to be different from her signature on other documents submitted. Compare, *Id.*, Exh. "A" with Exhs. "Q" and "U." Jerry Sarabella has not responded to inquiries from the Sureties seeking an explanation for the apparent forgery. *Id.*, ¶ 42.

On May 2, 1997, unbeknownst to the Sureties, Jerry Sarabella transferred his interest in the Premises to Natalie Sarabella for no consideration. *Id.*, ¶ 47 and Exhibit "U." At or about the time of the transfer, Jerry Sarabella asked USF & G about the status of the home exclusion. USF & G subsequently sent a letter agreement dated June 5, 1997 again agreeing to modify the Master Surety Agreement to provide for a homestead exclusion. The Sarabellas did not return an executed letter agreement. *Id.*, ¶¶ 59—61 and Exhibit W.

As recent as April, 1998, Jerry Sarabella has continued to use the Premises as his address. *Id.*, ¶ 63.

## CONCLUSIONS OF LAW

I. *Injunctive Relief: Specific Performance*

■ Generally, a plaintiff seeking a preliminary injunction must demonstrate (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair ground for litigation, and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Waldman Publ. Corp. v. Landoll, Inc.*, 43 F.3d 775, 779 (2d Cir.

1994), *citing Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77–78 (2d Cir.1994).

■ The Sureties seek specific performance by Jerry G. Sarabella of the collateral security clause in paragraph III(B) of the Master Surety Agreement, which provides that:

> UNDERSIGNED shall exonerate, indemnify, and keep indemnified SURETY from and against any and all liabilities, losses and expenses of whatsoever kind or nature (including but not limited to, interest, court costs and counsel fees) imposed upon, sustained, or incurred by SURETY by reason of (1) SURETY having executed, provided or procured BOND(S) in behalf of PRINCIPAL, or (2) UNDERSIGNED'S failure to perform or comply with any of the provisions of this AGREEMENT ...

Specifically, the Sureties seek to compel Jerry G. Sarabella to deposit cash and property in the sum of $2,839,050.00 as security for the bonds they have issued.

■ As plaintiffs concede, since they are requesting a "mandatory" injunction which commands a positive act that would alter, rather than preserve the *status quo*, they must meet a higher standard of proof than ordinarily required for a preliminary injunction. *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir.1997). Thus, Plaintiffs must also show either "clear" entitlement to relief or that "extreme or very serious damage" will result from a denial. *Id.*

■ The Sureties have met their burden of showing that they are clearly entitled to specific performance of the collateral security clause. Under New York law, a plaintiff is entitled to specific performance of contractual obligations if (1) there is a valid contract; (2) plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations; (3) defendant is able to perform its obligations; and (4) plaintiff has no adequate remedy at law. *La Mirada Products Co., Inc. v. Wassall PLC*, 823

F.Supp. 138, 140 (S.D.N.Y.1993) (citations omitted).

Irrespective of whether Natalie Sarabella's signature is forged, there is no dispute that the Master Surety Agreement is a valid existing contract between the Sureties, J. United and Jerry Sarabella. More importantly, paragraph III(B) of the agreement unambiguously requires J. United and Jerry Sarabella to post collateral security upon demand, when required to exonerate or indemnify the Sureties. Courts in New York have routinely upheld the validity of collateral security clauses and enforced their terms. *See American Motorists Ins. Co. v. United Furnace Co.,* 876 F.2d 293, 302 (2d Cir.1989); *American Motorists Ins. Co. v. Pennsylvania Beads Corp.,* 983 F.Supp. 437, 440 (S.D.N.Y. 1997); *BIB Constr. Co. v. Fireman's Ins. Co.,* 214 A.D.2d 521, 522–23, 625 N.Y.S.2d 550, 552 (1st Dep't 1995); *see also Safeco Ins. Co. v. Schwab,* 739 F.2d 431, 433 (9th Cir.1984).

In upholding a clause similar to paragraph III(B) which required the posting of collateral upon demand by the surety, the Appellate Division, First Department, held that such a collateral security clause is enforceable as long as the amount demanded by a surety is reasonable and the transaction is "at arm's length with relative equality of bargaining power." *BIB Construction,* 214 A.D.2d at 523, 625 N.Y.S.2d at 552. The burden of establishing that the costs and expenses were unreasonable or were incurred in bad faith rests with the defendants. *See Taylor Woodrow plc v. Blitman,* 603 F.Supp. 1152, 1155 (S.D.N.Y.1985) (indemnitor required to come forward with evidence of bad faith); *Acstar Ins. Co. v. Teton Enters., Inc.,* 248 A.D.2d 654, 655, 670 N.Y.S.2d 588, 589–90 (2d Dep't 1998) (surety entitled to summary judgment where indemnitors failed to establish surety's bad faith).

In the instant case, the Sureties demand deposit of $2,839,050.00 in security. This amount is based on the $1,302,308.00 in losses already paid by the Sureties, $73,-323.00 in expenses incurred by them to investigate claims, and $1,463,419.00 estimated to be their future costs in meeting their obligations on the performance and payment bonds. The amount demanded by the Surety clearly appears to be reasonable and nothing before the court indicates that the Master Surety Agreement was not the result of arm's length negotiations. Moreover, the Certification of Susan D. Weinstock explains that the Sureties incurred their costs and expenses only after investigating the various claims received against the subject bonds, and have incurred these costs and expenses in good faith.

Second, there is no question that the Sureties have substantially performed their obligations under the Master Surety Agreement and issued at least three bonds on behalf of J. United. After J. United defaulted in payment of subcontractors on three bonded projects and in performance of two of the projects, the Sureties have continued to meet their obligations under the bonds.

Third, while there is doubt whether Jerry Sarabella is able to deposit the entire amount of security deposited, he appears to have assets that he could deposit as security to meet some of his obligations under the Master Surety Agreement. In the Sarabellas' joint financial statement for 1994 submitted by Jerry Sarabella to the Sureties, the interest in J. United, which is wholly owned by Jerry Sarabella, is valued at over $1.3 million. Weinstock Cert., ¶ 48 and Exhibit V; Thompson Cert., ¶ 3. The financial statement also listed a one-third interest in Block 7206 Realty Corp. valued at $75,000.00. Given the financial difficulties apparently encountered by J. United which led to its recent bankruptcy filing, the value of J. United may very well have declined since 1994. However, since J. United filed a petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code rather than Chapter 7, the corporation appears to have some value as an on-

going concern. Thus, Jerry Sarabella should at least be able to deposit his shares in J. United and in Block 7206 Realty Corp.

Last, the Sureties have demonstrated a lack of an adequate legal remedy for breach of the security provision. Since their obligations under the bonds are continuing, the total loss to the Sureties is not yet ascertainable. As the Second Circuit recognized, "[w]here liability had not yet been determined but claims were expected, the surety had no legal remedy under that provision for an indemnification award, but it did have an equitable remedy for specific performance of the collateral security provision." *United Furnace,* 876 F.2d at 300; *see also La Mirada,* 823 F.Supp. at 141 (lack of legal remedy where damages uncertain); *BIB,* 214 A.D.2d at 523, 625 N.Y.S.2d at 552 (same).

Furthermore, as plaintiffs correctly note, the defendants' breach of the collateral security clause will result in immediate harm since the Sureties risk being deprived of bargained-for collateral and becoming a general unsecured creditor of Jerry Sarabella. *See United Furnace,* 876 F.2d at 302; *see also Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.,* 143 F.3d 688, 696 (2d Cir.), *cert. granted,* — U.S. —, 119 S.Ct. 537, 142 L.Ed.2d 447 (1998) (preliminary injunction appropriate where judgment may be uncollectible or where defendant has engaged in a pattern of secreting or dissipating assets). Certainly, given Jerry Sarabella's conduct in secretly transferring his interest in the Premises in May, 1997 after J. United began experiencing difficulties in meeting its obligations, there is reason to believe that his other assets may also disappear unless relief is granted. *Bridgestone/Firestone v. Recovery Credit Services,* 147 F.R.D. 66, 68 (S.D.N.Y.1993) (irreparable injury is established since as-

sets sought "are likely to disappear unless the application is granted").

## II. *Attachment*

The Sureties seek to attach the property of Jerry G. Sarabella and to attach and levy on the Premises. Entitlement to an order of attachment is governed by New York law. Fed.R.Civ.P. 64.[2] Section 6212(a) of the New York Civil Practice Law and Rules ("CPLR") (McKinney's 1980 and 1998 Supp.) permit an order of attachment to issue if a party establishes a prima facie case that (1) it has stated a claim for a money judgment; (2) it has a probability of success on the merits; (3) that one or more of the grounds set forth in CPLR § 6201 exists; and (4) the amount demanded by the party seeking attachment is greater than the amount of all known counterclaims. *See Bank Leumi Trust Co. v. Istim, Inc.,* 892 F.Supp. 478, 481 (S.D.N.Y.1995).

The Sureties clearly have met the first two requirements, since they are seeking judgment for monetary damages and are likely to succeed on the merits on their claim for indemnification against at least Jerry G. Sarabella. As discussed above, Jerry G. Sarabella and J. United entered into an enforceable Master Surety Agreement, which contained a provision requiring the signatories to indemnify the Sureties for all losses incurred. The Sureties have already sustained losses in excess of $1.3 million and at least Jerry G. Sarabella is likely to be found liable for monetary losses sustained by the Sureties.

Likewise, there is no issue as to the fourth factor, since the defendants did not appear to assert any counterclaims. Nor is it likely, on the record before the Court, that any legitimate counterclaims could be asserted.

**2.** Rule 64 provides, in pertinent part, that: [A]ll remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held ....

The Sureties further contend that they have satisfied the third requirement of demonstrating that a ground set forth in CPLR, § 6201 exists for issuance of an order of attachment. Section 6201(3)[3] requires proof of two elements: (a) that the defendant either is about to or has assigned, disposed of, encumbered or secreted property ... and (b) that the defendant has done so with the intent to defraud his or her creditors, or to frustrate the enforcement of a judgment that might be rendered in plaintiff's favor. *Bank Leumi*, 892 F.Supp. at 482; *Société Generale Alsacienne De Banque, Zurich v. Flemingdon Development Corp.*, 118 A.D.2d 769, 772, 500 N.Y.S.2d 278, 281 (2d Dep't 1986).

In this case, Jerry Sarabella's conduct in secretly transferring his interest in the Premises to his wife, Natalie Sarabella, suffices to establish a prima facie case that he transferred property with the intent to defraud creditors. Since direct evidence of fraudulent intent is rare, courts often look for the presence of "badges of fraud" which commonly accompany fraudulent transfers in determining whether to infer fraudulent intent. *MFS/ Sun Life Trust-High Yield Series v. Air Partners, Inc.*, 910 F.Supp. 913, 922 (S.D.N.Y.1995) and cases cited therein. Among the probative factors are (1) the closeness of relationship among the parties to the transaction; (2) whether the transfer is made secretly and not in the usual course of business; (3) the inadequacy of consideration; (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (5) the use of dummies or fictitious parties; and (6) the retention of control of property by the transferor after the conveyance. *Id., citing, inter alia, HBE Leasing v. Frank*, 48 F.3d 623, 639 (2d Cir.1995); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1041 (2d Cir.1984).

Most of the "badges of fraud" are present in this case. Jerry Sarabella transferred the Premises at a time when J. United was experiencing financial difficulties in meeting both performance and payment obligations with respect to at least the Lenox Avenue Subway project. As the President and sole shareholder of J. United, he undoubtedly was aware of the precariousness of J. United's financial condition long before the Sureties would first learn that J. United had failed to pay subcontractors on the two other bonded projects and had not performed in accordance with the NYCTA contract. All these failures would eventually cause the obligees on the three bonds procured by the Sureties to require the Sureties to honor their obligations under the bonds. This, in turn, would trigger Jerry Sarabella's individual obligations under the Master Surety Agreement to indemnify the Sureties.

Moreover, Jerry Sarabella transferred the Premises to his wife, Natalie Sarabella. Transfers between spouses must be scrutinized carefully. *Grumman Aerospace Corp. v. Rice*, 199 A.D.2d 365, 367, 605 N.Y.S.2d 305, 307 (2d Dep't 1993). The transfer was for no consideration even though the equity in the Premises reflected on the Sarabella's 1994 financial statement was $700,000.00. *See* Weinstock Cert., Exhibit V. In addition, around the time of the transfer, Jerry Sarabella in-

---

**3.** Section 6201 provides, in pertinent part, that:

> An order of attachment may be granted, except a matrimonial action, where the plaintiff has demanded and would be entitled in whole or in part, or in the alternative to a money judgment against one or more defendants, when:
>
> .  .  .  .  .
>
> (3) the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property ...

quired as to the status of the rider for a homestead exemption as to the Premises and was advised that no executed rider had been returned. He then made the transfer without giving notice to the Sureties. Since the Premises presumably were owned by Jerry and Natalie Sarabella as tenancies by the entirety, there ordinarily would no reason for such a transfer between spouses, absent a divorce or separation. Also, Jerry Sarabella appears to have continued to reside at the Premises after the transfer.

Further telling evidence of Jerry Sarabella's intent to deceive the Sureties is his submission of a signed Master Surety Agreement containing the purported signature of Natalie Sarabella. Jerry Sarabella undoubtedly was aware of the fact that the Sureties were relying on the validity of Natalie Sarabella's signature in honoring their agreement to extend surety credit and to procure bonds on behalf of J. United. If the signature is indeed forged as Natalie Sarabella advised the Sureties, Jerry Sarabella's subsequent transfer of the Premises further deceived the Sureties and deprived them of his joint interest in what may be one of the most valuable assets he owned. Under these circumstances, the Sureties have presented sufficient evidence to support a finding of fraudulent intent on the part of Jerry Sarabella. *See Elgin Sweeper Co. v. Melson Inc.*, 884 F.Supp. 641, 649 (N.D.N.Y.1995) (intentional fraud "is normally inferred from circumstances surrounding the transfer"); *see also Bank Leumi*, 892 F.Supp. at 483 (and cases cited therein).

Since the Sureties have met the requirements of CPLR § 6212, I recommend that their motion for an order attaching the personal property of Jerry G. Sarabella be granted.

■ The Sureties also seek an order of attachment against the Premises, which are now held by Natalie Sarabella. For the same reason that attachment is warranted against property directly held by Jerry Sarabella, attachment against the Premises, which were fraudulently conveyed by Jerry Sarabella to Natalie Sarabella, is also appropriate. *See Maro Hosiery Corp. v. Hann*, 59 A.D. 2d 674, 398 N.Y.S.2d 433, 434 (1st Dep't 1977). However, a "creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance." *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 126, 508 N.Y.S.2d 17, 25 (2nd Dep't 1986) (refusing to terminate a tenancy by the entirety to reach the debtor's fraudulently transferred interest in the property subject to his wife's right of survivorship prior to fraudulent conveyance). Thus, the Sureties are entitled to an order of attachment on the Premises only to the extent of Jerry Sarabella's interest in the tenancy-by-the-entirety transferred to Natalie Sarabella.

Last, CPLR, § 6212(b) specifies that a plaintiff seeking an order of attachment must give an undertaking in an amount fixed by the court to compensate the defendant for all costs and damages sustained by reason of the attachment should the defendant prevail. In light of the likelihood that the Sureties will prevail on their claims, I recommend that this court set an undertaking of $500, the minimum amount specified in Section 6212(b).

### III. *Injunction to Restrain Disposition of Property*

■ The Sureties also seek to enjoin Jerry Sarabella from transferring, disposing of or encumbering his assets and, as alternative relief should the court decline to order attachment of the Premises, to enjoin Natalie Sarabella from encumbering or disposing of the Premises. In light of the foregoing recommendation that this Court grant the Sureties' request for orders of attachment against Jerry Sarabella and the Premises to the extent of his interest therein, I recommend that the Court deny plaintiffs' motion as duplicative and unnecessary should attachment be ordered.

However, should the Court decline to order attachment, I recommend that the Court grant the requested injunction as to Jerry Sarabella. The Sureties have shown irreparable harm since there is a risk that all collectible assets will be dissipated. *See infra*, at pp. 922–923. J. United is in bankruptcy and Jerry Sarabella has conveyed his interest in the Premises, his second most valuable asset listed in his financial statement.

In addition, the Sureties have shown that they are likely to prevail on their claim to enforce the indemnification obligations imposed on Jerry Sarabella by the Master Surety Agreement. *See infra*, at pp. 921–923.

Moreover, New York law expressly permits a court to restrain the disposition of property. Section 279 of the New York Debtor and Creditor Law (McKinney's 1990) ("DCL") confers upon a creditor with an unmatured claim the right to proceed against any person against whom the creditor could have proceeded had his claim matured. *Id.* Among the remedies available, a court may:

    a.  Restrain the defendant from disposing of his property.

    b.  Appoint a receiver to take charge of the property.

    c.  Set aside the conveyance or annul the obligation, or

    d.  Make any order which the circumstances of the case may require.

*Id.*

As discussed above, the Sureties have established that Jerry Sarabella transferred the Premises to his wife with the intent to defraud creditors and that he may have fraudulently induced the Sureties to issue the bonds. *See infra*, at pp. 924–925. Thus, the Sureties are entitled to a preliminary injunction restraining Jerry G. Sarabella from transferring, disposing of, encumbering or secreting any of his

assets *pendente lite*, pursuant to DCL § 279(a). *See Galleon Syndicate Corp. v. Pan Atl. Group, Inc.*, 223 A.D.2d 510, 511–12, 637 N.Y.S.2d 104, 105–06 (1st Dep't 1996) (*pendente lite* injunction warranted where defendants transferred property in an attempt to hinder, delay or defraud creditors).

■   The Sureties also seek to enjoin Natalie Sarabella from transferring or otherwise disposing of the Premises. They correctly note that they have a right to proceed against Natalie Sarabella under DCL, § 279, which permits action against all persons against whom a creditor with a matured claim may sue. The only limitations are set forth in DCL, § 278, which bars claims against "a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser." *Id.* The undisputed facts establish that Natalie Sarabella was not a purchaser for fair consideration.

Although the Sureties may have a right to proceed against Natalie Sarabella under DCL, § 279 in order to prevent a fraudulently conveyed asset from being dissipated, I recommend that the Court not grant the specific relief requested by the Sureties to prevent Natalie Sarabella from dealing with the Premises. Since Natalie Sarabella also has her own original interest in the Premises which, on the record now before the court, is not subject to the reach of Jerry Sarabella's creditors, an order preventing her from encumbering or disposing of the Premises would unduly hamper her rights.[4] Moreover, such an injunction would be more restrictive than attachment since a levy of attachment simply puts subsequent purchasers on notice that any sale will be subject to the plaintiff's pre-existing rights, but does not operate to prevent a sale. *See Finance Investment Company (Bermuda) Limited v.*

---

4. For all practical purposes, the Sureties would actually benefit from her sale of the Premises for fair value, since such a voluntary liquidation would eliminate any barriers faced by the Sureties in her tenancy-by-the-entirety.

*Gossweiler,* 145 A.D.2d 462, 463 535 N.Y.S.2d 633, 634 (2d Dep't 1988) (owner of attached premises who sells the land and deposits proceeds in escrow not in contempt).

Should the Court not grant an order of attachment on the Premises, I recommend that the Court enjoin Natalie Sarabella only from entering into any contract or agreement to sell, encumber or otherwise dispose of the Premises without giving at least two weeks' notice to the Sureties and to any purchaser or potential mortgagee of the pendency of this lawsuit. Thus, should the Sureties feel that any contemplated sale or mortgage of the Premises would diminish their interests, they will have sufficient notice to challenge the sale or mortgage as not being based on fair market value or, in the case of the mortgage, exceeding Natalie Sarabella's interest in the Premises. If Natalie Sarabella has already entered into a contract or agreement to sell, encumber or dispose of the Premises, she should be required to give immediate notice of such contract and agreement to the Sureties.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the Court:

(1) Grant the plaintiffs' motion for a preliminary injunction to require Jerry Sarabella to post collateral as required by the Master Surety Agreement;

(2) Grant the plaintiffs' motion for an order of attachment against all the assets of Jerry Sarabella, including his interest in the shares in J. United and Block 7206 Realty Corp.;

(3) Grant the plaintiffs' motion for an order of attachment against the Premises to the extent of the interest conveyed by Jerry Sarabella to Natalie Sarabella on May 7, 1997;

(4) In the event the Court denies the motion for an order of attachment against Jerry Sarabella's assets, grant plaintiffs' motion to enjoin Jerry Sarabella from transferring, disposing of, encumbering or secreting any of his assets *pendente lite,* pursuant to DCL § 279(a);

(5) In the event the Court denies the motion for an order of attachment against the Premises, grant, in part, plaintiffs' motion for injunctive relief (a) enjoining Natalie Sarabella from entering into any contract or agreement to transfer, encumber or otherwise dispose of the Premises without giving at least two weeks' notice to the Sureties and to any potential purchaser or mortgagee of the pendency of this lawsuit and (b) if she has already entered into a contract or agreement to sell, encumber or dispose of the Premises, requiring Natalie Sarabella to give immediate notice of such contract and agreement.

A copy of this Report and Recommendation is being mailed by Federal Express to the parties on this date. Any objections must be filed with the Clerk of the Court, with a copy to the undersigned, by March 5, 1999. Failure to file objections within the specified time waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

**SO ORDERED.**